**Angela Dawn WALDROP, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–06–00073–CR.**

Court of Appeals of Texas, Texarkana.

Submitted Jan. 24, 2007.

Decided March 22, 2007.

John Hunter Smith, Nall, Pelley and Wynne, Sherman, for appellant.

Michael Morrow, Asst. Dist. Atty., Richard Glaser, Dist. Atty., Bonham, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

Angela Dawn Waldrop was convicted of two counts of fabricating evidence and sentenced to ten years' confinement for each offense, the sentences running concurrently. See TEX. PENAL CODE ANN. § 37.09(a)(2) (Vernon 2003). In this case, she appeals her conviction related to the Bonham Police Department's (BPD) investigation of allegations that her former husband sexually abused her daughters.[1]

## I. FACTUAL BACKGROUND

On December 11, 2004, Waldrop called the BPD reporting that her two daughters made allegations that Waldrop's former husband (who was the biological father of one of the girls) had sexually assaulted the girls. Officer Joe White from the BPD met with Waldrop and her daughters and transported them to the police station. When White learned that some of the allegations related to actions outside the city limits but within Fannin County, he contacted the Fannin County Sheriff's Office to, as he testified, "take a report also." Deputy Rick Milner of the sheriff's office responded.

At the end of the initial meeting on December 11, both White and Milner completed reports on the matter and attached Waldrop's written statement to their respective reports. Milner informed Waldrop that the girls would have to undergo interviews at the Child Advocacy Center (CAC) and undergo physical examinations. Milner also advised Waldrop to contact one of the investigators at the sheriff's office. On December 13, Waldrop did just that, speaking to Lieutenant David Perkins of the sheriff's office and turning over to him a microcassette recording of the girls' accounts of the sexual abuse.

Perkins listened to the audiotape and suspected the girls were coached in making their statements based on indications that the girls were reading prepared material and that Waldrop could be heard coaching them on the content of the statement. Perkins then contacted BPD investigator Wendell Bockman regarding the investigation and the audiotape Waldrop had given to Perkins. Despite the officers' suspicions, both agencies continued their investigation into the matter, and the CAC conducted forensic interviews of the girls. The interviews confirmed that the allegations were false. In fact, the girls denied that their father had sexually abused them and explained that their "real" mother,

---

1. In a related appeal, Waldrop appeals her conviction for fabricating evidence with respect to the Fannin County Sheriff's Office's investigation of the allegations of sexual abuse. See Waldrop v. State, cause number 06–06–00074–CR, 2007 WL 845011.

"Angie," made them say several lies about their family on the tape recorder.

Based on Waldrop's production and presentation of the recording of the false allegations, the State charged her with fabricating evidence with the intent to affect the outcomes of the investigations of both the BPD and the sheriff's office. Here, Waldrop now appeals her conviction relating to the investigation by the BPD, limiting her argument to the legal and factual sufficiency of the evidence to support the element that she "presented" the evidence to the BPD and the factual sufficiency of the evidence to show that she knew the allegations were false.

## II. APPLICABLE LAW

### A. Fabricating Evidence

A person commits an offense if, knowing that an investigation or official proceeding is pending or in progress, he or she "makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding." TEX. PENAL CODE ANN. § 37.09(a)(2). In this appeal, Waldrop challenges her conviction related to the BPD's investigation on the bases that she never "presented" the audiotape to the BPD and that she did know of the falsity of the allegations on the audiotape. Rather, she contends, she turned the audiotape over to the sheriff's office—not the BPD—and, therefore, the evidence is legally and factually insufficient to support her conviction for fabricating evidence as it relates to any investigation by the BPD.

### B. Standards of Review

In reviewing the legal sufficiency of the evidence, we view the relevant evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential ele-

ments of the crime beyond a reasonable doubt. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000). In a factual sufficiency review, we view all the evidence in a neutral light and determine whether the evidence supporting the verdict is so weak that the jury's verdict is clearly wrong and manifestly unjust or whether the great weight and preponderance of the evidence is contrary to the verdict. *See Watson v. State,* 204 S.W.3d 404, 417 (Tex.Crim.App. 2006); *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996).

## III. ANALYSIS

Waldrop points to the testimony of BPD investigator Bockman to support her contention that the evidence failed to show that she gave the audiotape directly to anyone at the BPD. On this very particular point, we agree. Bockman did testify that Waldrop did not give him the audiotape. In fact, it appears that no one at BPD knew about the audiotape until Perkins of the sheriff's office contacted Bockman and informed him of the development. Officer White testified to this effect, stating that Waldrop made no mention of the audiotape during the initial contact with law enforcement agencies. As to the effect of this testimony, however, we disagree with Waldrop's position.

### A. Presented the Audiotape

■ First, the plain language of Section 37.09 does not require that the actor present the evidence in question directly to the investigating agency. Again, Section 37.09 provides that a person commits an offense if, knowing that an investigation or official proceeding is pending or in progress, he or she "makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding." TEX. PENAL CODE ANN. § 37.09(a)(2). The Texas Penal Code does

not provide a specific definition of the term "present," so we continue our analysis with the understanding that we employ the "common usage" of the term "present," meaning "to bring or introduce into the presence of someone" or "to offer to view." *See* TEX. GOV'T CODE ANN. § 311.011 (Vernon 2005); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 982 (11th ed.2006).

In pertinent part, Section 37.09 requires that the actor present the evidence with the requisite knowledge that the evidence is false and with the intent that the evidence affect the outcome of the investigation; it does not specify to whom such evidence must be given in order to complete the offense. While, in most cases, the actor will have given the falsified evidence directly to the investigating agency, we do not think that Section 37.09 is necessarily so limited.

Reviewing the structure of the provision, we note that there is no link between the "present" element and any specific agency. Waldrop's reading of the statute inserts an imaginary prepositional phrase following "present" in order to identify and limit to whom the evidence must be presented. We will not read into the provision such a phrase and, instead, conclude that Section 37.09 does not require that the actor present the evidence directly to each agency investigating the matter.

We think this interpretation of the provision is consistent with the practical application of Section 37.09. In the investi-gation of any alleged offense, it is not uncommon for more than one agency to investigate the matter as it develops or to contact other agencies that may be directly or indirectly involved in the investigation or a related matter. Indeed, here, where a report is made that a parent or caretaker has sexually abused a child, Texas law requires a joint investigation. *See* TEX.CODE CRIM. PROC. ANN. art. 2.27 (Vernon 2005); TEX. FAM.CODE ANN. §§ 261.001, 261.301 (Vernon Supp. 2006); *see also Waldrop v. State*, No. 06–06–00074–CR, 2007 WL 845011 (our opinion in the companion case). To read into the statute that an actor would have to turn over falsified evidence directly to each agency that may have become involved would render the statute unworkable in the reality of complex investigations.

■■■ We reject Waldrop's narrow reading of "present" as it relates to Section 37.09 and conclude that Section 37.09 does not specifically require that the evidence at issue be presented directly to the investigating agency. Here, the evidence demonstrates that Waldrop presented the falsified audiotape. The fact that she presented the tape directly to Perkins, rather than Bockman, does not render the evidence factually insufficient to support the jury's verdict. Section 37.09 does not specify to whom the evidence must be presented in order to constitute an offense under that section.[2] That said, the record

---

**2.** Our holding today does not allow an unreasonable application of Section 37.09 in a case in which a false document, record, or thing was given to just anyone. If the link between the person or persons to whom an actor presents the falsified material becomes too tenuous, then the issue raised will go to the intent element of the offense rather than the presentment element. That is, if the actor gives the falsified evidence to someone who is not directly connected to the investigation, then the issue may arise whether the actor intended that such evidence affect the outcome of the investigation. The intent issue, rather than the presentment issue, necessarily limits the category of people to whom the actor must present the evidence in question. Such issue is not raised here. Waldrop does not challenge the intent issue. She does not argue that she lacked the intent to affect the outcome of the investigation of the BPD when she turned the audiotape over to the sheriff's

here sufficiently demonstrates that Waldrop presented the audiotape to Perkins intending to affect the course or outcome of the investigation. Since she does not challenge the intent element, we need only point to the uncontroverted evidence that Waldrop gave the audiotape to Perkins in order to conclude that this evidence is legally and factually sufficient to support the jury's verdict.

## B. Made the Audiotape

■ Second, we note that Section 37.09 makes it an offense not only to "present" evidence under certain circumstances, but also makes it an offense to "make" or "use" that evidence under the same circumstances. Both the indictment and the jury charge track the language of Section 37.09 in this respect, authorizing the jury to return a verdict of guilty if it found that Waldrop "did . . . make or present or use" the audiotape and found that the evidence satisfied all other elements of the offense.

Here, the record is replete with evidence that Waldrop "made" the audiotape recording. Perkins testified that Waldrop gave him the audiotape December 13 and described it as a tape Waldrop made of the girls' statements. He also explains that, when he first listened to the tape, he heard Waldrop's voice coaching and prompting the girls on what to say. Waldrop's young daughters both were emphatic during their interviews at the CAC that their biological mother, "Angie," made them tell several

lies about their family[3] into the tape recorder. The daughters' testimony echoes the point that "Angie" made them say false things into the tape recorder. The older daughter explained that Waldrop wrote down what Waldrop wanted her to say into the recorder. This statement is corroborated by the recognizable cadence of a new reader, which was made obvious as the eight-year-old girl read the allegations and by the familiar announcement "the end" when she finished reading her passage. Further, although the audio quality of the recording is less than perfect, there is a female voice, presumably that of Waldrop, prompting the younger daughter on the contents of her recorded statement.

No evidence suggests that anyone other than Waldrop was responsible for the recording of the false allegations. Therefore, since Waldrop does not challenge the element of intent and we conclude that the record sufficiently supports the finding that Waldrop "made" the audiotape of false allegations, we conclude on this alternate basis that the evidence is legally and factually sufficient in this respect to support the jury's finding beyond a reasonable doubt that Waldrop committed the elements of the offense charged.

## C. Knowledge of Audiotape's Falsity

■ In her brief, Waldrop states that "[t]he only evidence in the record to support a finding that the Appellant's pres-

---

office. Instead, she focuses on the act of presentment, arguing that she did not "present" the audiotape directly to the BPD and, therefore, committed no offense. We conclude that the evidence does show she presented the audiotape within the meaning of Section 37.09.

3. Portions of the record also suggest that Waldrop may have made this recording in an effort to regain custody of her two daughters who were, at the time, living with their grandparents and had been in temporary foster

care a short time before this incident. This is consistent with the fact that the girls were prompted to say on the tape that they wanted to live with Waldrop when the CAC interviews revealed that quite the opposite was true. So, there is some evidence that Waldrop may have also made the tape with the intent of affecting the outcome of the official proceeding which appears to have been underway to terminate her parental rights to these two daughters.

entment of the tape was false is the controverted testimony of the children." The Texas Rules of Appellate Procedure require us to construe her argument liberally. *See* Tex.R.App. P. 38.1(h), 38.9. Therefore, we will read this portion of her argument as raising the factual sufficiency of the evidence to support the element that Waldrop knew that the sexual assault allegations were false.

We first look to the audiotape itself. Again, the tape contains a voice, which the uncontroverted evidence indicates as Waldrop's, coaching and prompting the younger daughter on what to say into the tape recorder. With respect to the statements from the older daughter, we recognize from her cadence and her announcement of "the end" that she is reading a prepared statement alleging sexual abuse and several other misdeeds by the family in whose care she was at the time. Also noteworthy is the seemingly forced announcement, "I want to live with my mama," that followed her recitation of the allegations.

The CAC interviews of the girls confirm what seemed to be the case from the clues on the audiotape. In those interviews, the girls deny all the allegations made on the tape recorder, especially the statement that they wanted to live with their mother. Each explained that, while they were visiting their mother, their mother made them say several lies about their family into the tape recorder. Both girls made it clear that the statements on the tape recorder were not true and that it was "Angie" who made them say those things.

The girls' trial testimony further supports the conclusion that Waldrop knew the allegations were false. The younger daughter testified that those were her mother's words on the tape, not her own.[4] The older daughter also explained that, "It wasn't me talking," and that Waldrop wrote down the statements on a piece of notebook paper.

From the audiotape, the CAC interviews, and the testimony, the jury could have reasonably inferred that Waldrop felt the need to coach and prompt the younger daughter and needed to write down a scripted version of alleged events because Waldrop knew the allegations to be false. It was reasonable to conclude that, had the allegations been true, such instruction would likely have been unnecessary. No evidence in the record suggests that the allegations were true or that Waldrop had reason to believe those allegations were true. We, therefore, conclude that the evidence that Waldrop knew the allegations on the audiotape were false is factually sufficient to support the jury's verdict.

## IV. CONCLUSION

Viewing the evidence in a light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt the essential elements of an offense under Section 37.09(a)(2) of the Texas Penal Code. The evidence demonstrates that Waldrop made and presented the audiotape of false allegations and that she knew the allegations of sexual assault were false. The evidence does not suggest that any other individual made the audiotape or that Waldrop reasonably could have believed the allegations to be true. Viewing this evidence in a neutral light, we conclude that the evidence supporting the verdict is not so

---

4. She goes on to testify that her mother mimicked her voice on the audiotape. Although this scenario seems unlikely on hearing the tape and Waldrop points to this testimony to undermine the jury's verdict, the jury is the sole judge of credibility and could have reasonably concluded that this was a mechanism for the daughter to distance herself from the allegations on the tape rather than false testimony.

weak that the verdict is clearly wrong or manifestly unjust. We overrule Waldrop's points of error.

We affirm the trial court's judgment.