

# NUMBER 13-19-00341-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

TOMMY ELI CABELLO,                                                                Appellant,

v.

THE STATE OF TEXAS,                                                              Appellee.

### On appeal from the 214th District Court
### of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Silva
### Memorandum Opinion by Justice Hinojosa

A jury found appellant Tommy Eli Cabello guilty of continuous violence against the family, tampering with a witness, and tampering with or fabricating physical evidence, and the trial court sentenced appellant to ten years of imprisonment. *See* TEX. PENAL CODE ANN. § 25.11 (continuous violence against the family); *id.* § 36.05(a) (tampering with

witness); *id.* § 37.09(a) (tampering with or fabricating physical evidence). By three issues, appellant contends: (1) the trial court abused its discretion in admitting the State's extraneous offense evidence surrounding the assault of Gloria Lerma and the subsequent investigation; (2) the trial court abused its discretion in admitting evidence regarding "many" extraneous offenses under Texas Rule of Evidence 404(b) and in violation of Texas Code of Criminal Procedure article 38.371(c); and (3) the evidence was legally insufficient to support the jury's finding of guilt on all three counts. *See* TEX. R. EVID. 404(b); TEX. CODE CRIM. PROC. ANN. art. 38.371(c). We affirm.

## I.    BACKGROUND

In summary, appellant was a police officer who was married to Ernestina Cabello (Tina).[1] The couple began dating in 1997, married in 2000, divorced in 2012, remarried in 2016, and began divorce proceedings again in 2018. Their relationship was turbulent, intermittent, and marked by repeated allegations that appellant committed family violence and that both appellant and Tina made misrepresentations regarding those episodes of violence. The incidents that gave rise to this criminal proceeding occurred near the end of their relationship in late 2018. We review the proceedings and evidence presented in the guilt or innocence phase of trial.

## A.    Officer Jordan Armstrong

Officer Jordan Armstrong from the Robstown Police Department (RPD) testified that he was on shift on the evening of November 25, 2018. He received a call for service regarding a disturbance in progress at the Cabello residence in Robstown. He responded

---

[1] The reporter's record also refers to the complainant as "Erenestina."

2

at approximately 2:50 a.m. and found appellant standing in the driveway of the home. Appellant informed Officer Armstrong that appellant's minor son had called the police, that appellant and his wife, who were separated, had an argument, but that the argument was not physical in nature. According to Officer Armstrong, appellant was "calm and cooperative."

Officer Armstrong then entered the house and met with Tina, who informed him that appellant had "grabbed her by her arm" at some point during an argument. When pressed for more information, Tina maintained that she "did not want any police intervention," "she did not want anything written," and she "actually just wanted [appellant] to leave the residence."

Officer Armstrong then returned outside to speak with appellant and told appellant that he was going to generate a report "based on [Tina's] allegation of being harassed by [appellant.]" Appellant told Officer Armstrong that Tina's allegations were false and "that he did not grab her at any time during the argument." Officer Armstrong nevertheless completed the assault family violence packet and asked Tina if she wanted to file charges against appellant, provide a statement, or sign any of the documents, which included a request for an emergency family violence protective order, but Tina indicated that she did not. Officer Armstrong examined Tina's arm under ambient house lighting with the additional use of his flashlight, but he did not see redness, bruising, or any indication of physical assault. Officer Armstrong testified, however, that an assault does not require "visible injuries." Officer Armstrong did not ask Tina if the "grabbing" incident was painful.

3

**B.     Tina Cabello**

Tina testified that she dated appellant from 1997 to 2000, and they married on April 22, 2000. Tina acknowledged that it was hard to testify at trial because she did not "want to hurt [appellant]" and she "still love[d] him." Tina testified that there was only one incident of violence before they married when appellant "got upset and grabbed [her] and then grabbed [her] purse and threw it to the street."

**1.     2002 or 2003 Incident**

Tina testified that, in approximately 2002 or 2003, she and appellant went out socially with her cousin Velma. An argument ensued between Tina and Velma told her that as Tina was walking away from appellant, "[h]e was turning on the [cigarette] lighter as if he wanted to burn [Tina's] hair." Tina and Velma then returned to the couple's apartment. Although Tina had told appellant to go to his mother's home, appellant instead went to the couple's apartment, stood in the doorway, and asked for his gun. Tina and Velma called law enforcement, appellant left, and law enforcement came and collected one of appellant's guns.

After the police left, Tina testified that appellant called her and convinced her to let him return to their apartment, which he did. Tina testified that once he arrived at the apartment, appellant came "from behind [her] all of a sudden and put[] [a] gun to [her] head" and "clicked it." Tina testified that she fell to the floor crying. Appellant subsequently told Tina that he "wouldn't have done it." Tina explained that she did not call the police regarding this incident as appellant "was mad because they took away his gun," and "[h]e said he was going to get in trouble at work [as a police officer] all because of me," so she

4

"felt bad" and "felt like it was [her] fault."

## 2.    August 2010 Incident

Tina testified regarding another incident, occurring on August 15, 2010, after she went out to eat with her sister, Lerma, and one of Lerma's friends. When Tina returned to the couple's home, appellant "storm[ed] out of the washroom in the garage," grabbed her by her hair, and physically took her into the house. She testified that appellant then "swung [her] to the side and [she] hit [her] head on the TV." Lerma called her shortly thereafter, and Tina told her what had transpired. Lerma returned to the couple's house, screaming and angry, and began kicking appellant's patrol car. Appellant exited the residence and exchanged "words" with Lerma. Tina testified that Lerma told her that she should leave appellant, that appellant, and in response, appellant "went at" Lerma and hit her face with his hand. Tina said that appellant had hit her in a similar manner in the past. Police arrived and questioned all three individuals. Both Tina and Lerma told the officers that the events had been captured on the couple's security footage, but the officers did not attempt to obtain a copy of the footage at that time.

Tina explained that on the evening in question, she and appellant had a security system with five cameras, and the cameras were pointed in the direction where they recorded both the "hair pulling" incident with Tina and the "punch" to Lerma. Tina testified that she and appellant reviewed the security footage the day after the incident on a television in the couple's living room, where the entertainment center held the television and a DVR for the security system. Tina stated, "You could see where he hit my sister and she went down to the ground," and "you could see us around her, trying to get her

5

up, because she could not breathe[,] and she was crying."

Tina stated that, at some unspecified point, appellant subsequently called her and informed her that the police were at the house with a search warrant regarding the DVR security recording. Tina testified that appellant was "panicked and scared," and after initially instructing her not to come home, ultimately told her to return and said "[w]henever you get here, and [the police] ask you questions, just tell them . . . that the DVR was broken," "it wasn't . . . working," and that they "had got[ten] rid of it." She asked what he meant, and he told her not to "worry about it" and he would "take care of it." Appellant ultimately told Tina that he put the DVR "somewhere in the attic" while the police were waiting outside to execute the search warrant.

When Tina arrived home, appellant informed the police that the DVR was broken, and Tina confirmed his statement. Tina testified that the DVR was in place and working the morning before the police executed the search warrant for the DVR security footage. Tina explained that appellant had asked her to lie on his behalf several times and that she lied on this occasion for the same reasons she had done so previously: she "would always feel bad," "[h]e always made [her] feel like everything was [her] fault," and she "just felt like it was [her] fault."

Tina identified and discussed an August 17, 2010 signed statement that she provided to the police. The statement provided:

Detective Gonzalez,

This incident that occurred on Sunday, August 15th, should never have occurred[.] I asked my sister not to come by the house because I did not want for her to get in trouble. I begged her several times on the phone. When she told me[,] she was right down the road[,] I ran outside to keep her

from coming inside. I ran to her vehicle and I opened the door. It was her friend Ashley Romero only. I asked[,] "Where is [Lerma]?" Ashley told me she was coming down the street walking . . . I run towards [Lerma] to stop her from going inside and told her to please leave over and over. [Lerma] was very upset and began kicking my husband's take home vehicle from the Corpus Christi Police Department. I told her to stop[,] or she was going to get in trouble. [Lerma] was yelling as I was trying to hold her against my vehicle. I repeatedly asked her to stop. [Appellant] comes out saying that [Lerma] needed to get off of his property or else he was going to call the police. I asked him not to because I did not want any trouble for my sister, [Lerma]. As I was holding [Lerma] back and she heard [appellant's] voice[, s]he comes at [appellant] with me still in front of her. I'm screaming and crying for her to stop as she pushes me out of the way and makes contact with [appellant]. Then [appellant] pushes [Lerma] away and [Lerma] falls to the ground. After this incident occurred[,] my sister told me that she was going to have [appellant's] badge and that he would be without a job. [Lerma] also tells me that I need to leave [appellant] and that if I don't leave [appellant] that she will make sure he leaves me. The above is true and correct.

Tina testified that appellant instructed her to use specific words in her written statement to "make sure" that the police believed that Lerma instigated the physical altercation "so [appellant] could say it was self-defense and he would not get in trouble." Tina testified that, contrary to her written statement, Lerma never pushed her away and Lerma did not initiate contact with appellant. She further testified that appellant did more than push Lerma; rather, appellant actually hit Lerma "with full force." Tina admitted that she lied to the police to help appellant. Tina testified that she also lied to a grand jury regarding this incident, and that she told the grand jury, "everything that [appellant] told [her] to say."

During questioning, the State confronted Tina with the defense's theory that her statements in 2010 were truthful and her trial testimony was not. The State specifically asked Tina, "You understand that [appellant] is now saying that what you, in fact, said in

7

that statement is true and that this never happened," at which point defense counsel objected to this question as "a comment on [appellant's] failure to testify," and requested a mistrial, which the trial court denied.

### 3. November 2010 Incident

Tina next testified about an incident that occurred in November of 2010 when appellant "grab[bed her] from [her] hair," and in the course of a physical struggle, hit her head with his hand, causing her head to "burn" and bleed. She called the police regarding this incident but "didn't want to get [appellant] in trouble or have a record," so she just gave the police her name and address. The police came and appellant instructed her to answer the door and "make sure and tell them there is nothing wrong." When Tina pointed out that she had a visible, bleeding cut on her forehead, appellant told her to instead go into the bathroom and turn on the shower. She did so and waited there until the police left without questioning her.

Tina testified that she felt appellant would never face any consequences for his actions because "he was a cop" and "things were not going to get done." Appellant told Tina that her calls to the police "do[] not matter," and that he would "make sure [she] look[s] like a dumb-ass." On one occasion, appellant told her to "[c]all the cops, bitch . . . . They won't do shit."

Tina testified that she called Johnny Brown, a police officer who was one of their mutual friends, regarding an incident where appellant told her that "he was going to get the gun and shoot [her] ass." She told Brown what had happened and reminded him of the situation where appellant put a gun to her head. Brown approached appellant

8

regarding Tina's allegations, and appellant told Brown that Tina was "pissed off because she caught me in bed with somebody." Tina testified that this was not true. However, Tina acknowledged that appellant had "cheated" on her before, and the first time occurred "before 2007" when she was pregnant with their daughter.

### 4. 2011 Incident

Tina testified that she filed for divorce from appellant the first time in approximately 2011, and that divorce was finalized in 2012. In 2011, when the divorce proceedings were ongoing, Tina was driving to her divorce attorney's office when her coworkers called her and advised her that someone was following her. She saw appellant, hid in a parking space until he had passed, and then continued driving. Tina testified that appellant eventually caught up to her and repeatedly swerved his vehicle at hers, causing her to fear that he would hit her. According to Tina, appellant eventually cut her off in traffic, parked in the middle of two lanes, and began walking toward her vehicle. Tina testified that she drove around him and continued to her attorney's office.

### 5. 2013 Incident

Tina next testified regarding an incident that occurred in the garage of her house in 2013 or 2014. She and appellant were having a "disagreement" that escalated when appellant retrieved his gun from the guest closet in the foyer. Tina ran into the garage and out to the street, where she saw a neighbor and yelled her name. Appellant stopped inside the garage and "put the gun down." Tina testified that appellant eventually left the house on this occasion.

9

### 6. 2016 Incidents

Tina further testified regarding an incident that occurred in June of 2016 "around the Father's Day weekend" at a hotel where they were staying with their children and some friends. Tina and appellant had a disagreement in the hotel room where they were staying with the children, and appellant pushed her. To get away from appellant, Tina took their children to eat at a restaurant in the hotel, then went to their friends' adjoining hotel room. Appellant located Tina and the children and began banging on the door, yelling, and cursing. Tina testified that appellant ultimately calmed down, "trick[ed] her" into believing "that everything [was] ok," and Tina opened the door to the room. Appellant entered and again began yelling and cursing. He told Tina that he "should just fucking throw [her] off the patio." Tina testified that their oldest son, Elijah, physically intervened in the altercation on her behalf.

Tina also testified about an incident that occurred in September of 2016. She and appellant had recently remarried and had a party to celebrate at a hotel. Their group was too loud, and the management asked them to leave and called the police. Tina, who had wanted the party to include fewer people, complained about the incident to appellant and he became angry. On the drive home, appellant cursed at Tina in front of the children, and Tina told appellant that she "should have never remarried" him. Appellant then "hit [her] three times" in the jaw, the temple, and the back of her head. Tina stated that the children, who were in the car, were "screaming and crying." Appellant stopped hitting her when Elijah told them that he was recording the incident on his cell phone.

10

### 7.    2018 Incidents

Tina further testified regarding three incidents in 2018. That year, she underwent spinal neck surgery for spinal stenosis. Before the surgery, she and appellant had a disagreement, and he grabbed her and pinned her against the wall while lifting her chin up. After the surgery, there were "maybe" two other times in November when he "did the same thing pretty much or sometimes he would just grab [her . . . ] from the head," and "he would just push [her] back and to the point where [she] would sometimes hear the back of [her] neck pop." Tina agreed that that appellant was "striking" her during these events.

Tina testified regarding the events that occurred on November 25, 2018, that formed the basis for the charges in the indictment. Although the couple was in the process of obtaining their second divorce, they had attended a karaoke party together. Afterward, appellant was at their home, and Tina asked him to leave, but he did not.

Tina eventually went to sleep, but appellant woke her, and became angry while discussing their relationship. According to Tina, appellant threatened that she would never see their children again, and she countered by telling him that she would be able to obtain custody of their children. Appellant laughed and told her he was "going to make [damn] sure" that she did not see the children again. Tina got out of bed, instructed appellant to leave, and told him that she would call the police. Appellant laughed and said, "They can't do shit to me unless I do something."

Tina took appellant's phone and went to the living room, where her oldest son Elijah was sitting. Tina told appellant that she would not call the police, put the phone on

11

the kitchen island, told him to leave again, and started back to her bedroom. Tina explained that appellant then "grabbed" her and "turned [her] completely." Tina testified that she was scared, screamed, and told Elijah to call the police. Appellant "grab[bed her] from the other side," and told Elijah not to call the police. However, at that point, Elijah, who had retreated to a bathroom and locked himself in, had already called in the disturbance.

The police arrived while appellant was trying to leave the premises. Tina testified that she did not want to "get [appellant] in trouble," and so she told the police that she did not want "to do anything," because "[h]e didn't do nothing to me right away or whatever." Tina nevertheless confirmed that appellant grabbed her twice "forcefully," first from one side as she turned, and then from the other side. She felt the sides of her arms "burn" and testified that she felt pain.

Tina testified that about two weeks after the incident, she met with one of the detectives from the RPD. She could not recall his name at trial. Tina provided the detective with a series of three recorded conversations that she had made with appellant regarding the events that occurred on the evening of November 25. According to Tina, she made these recordings because appellant had threatened the children.

Tina explained that, after the incident, appellant and the police left. Appellant called her repeatedly that night, threatening suicide in one of the calls. Appellant eventually returned to their home. Later that evening, appellant woke Tina up to discuss making a recording in which Tina would withdraw her allegations regarding the incident. In explaining her reaction, Tina thought that she "would just say that it didn't happen," which

she had "already done several times with other incidents." Tina told appellant that she did not want to make a recording recanting her allegations against him, but he told her it was "all [her] fucking fault." She cried and felt bad, so she agreed to make the "fake recording." Tina acknowledged that she felt pressured to make the fake recording because, among other reasons, appellant told her he would lose his job if she did not. According to Tina, appellant also hoped that she would give up on the divorce, but "his main goal was to keep his job."

Tina made a recording of their initial conversation, during which appellant pressured her to provide a statement exonerating him, made the "fake" recording recanting her allegations, and also made a third recording of the process of making the fake recording, which included appellant's comments and reaction to the fake recording. Tina testified that she ultimately provided these three recordings to the police. The recordings were introduced into evidence and played for the jury.

Tina testified that during this period of time, although appellant was telling her that he wanted to reconcile and reunite, appellant was actually dating Norma DeLeon. Tina testified that she had suspected him of having a relationship with DeLeon beginning in August of 2018, but denied that she had seen appellant's Facebook or Messenger accounts, which included posts and messages regarding that relationship. According to Tina, appellant and DeLeon's relationship was a subject of argument or disagreement because she did not understand why he would try to reconcile with her if he was dating DeLeon. Tina further testified regarding text messages, including photographs, that she had received from Julian Flores, who was a mutual friend of Tina and DeLeon. Julian first

13

contacted Tina on November 2, 2018, and she received the photographs from him on May 4, 2019. The images depict appellant and DeLeon together and include one sexually explicit photograph of appellant providing oral sex to DeLeon. Tina denied ever receiving any messages directly from DeLeon and asserted that Julian's text messages comprised the first time that she had received a photograph depicting appellant and DeLeon engaging in a sexual act.

Tina acknowledged that her current petition for divorce from appellant alleges that their relationship is "insupportable" and does not allege that appellant has engaged in family violence or committed assault. She further acknowledged that after their first marriage, she obtained a judgment against appellant for past due child support, and appellant continued paying child support even after they remarried in 2016. Upon cross-examination, Tina denied that she had ever purchased guns for appellant or that she had called a friend to ask what type of hunting rifle he would like. She acknowledged that between the divorce in 2012 and the remarriage in 2016, the couple lived together intermittently, occasionally went to social occasions together, and took trips together.

When Tina filed for divorce in September of 2018, she did not immediately file for a protective order from appellant. She testified that she never wanted one, and the police told her there was one in place when they arrested him. In the divorce proceedings, Tina agreed to withdraw the protective order and substitute a mutual injunction. She has agreed to allow appellant to have unsupervised visitation with the children subject to the approval of the counselor who is participating in the divorce proceeding.

Tina testified that she told Rebecca Campbell, a marriage and family therapist who also provided testimony at trial, that appellant never hit her because her "kids are [her] everything," and "[appellant] would tell me if I said something that I would lose them." She testified that she believed this threat. Tina further explained that she told a counselor from the Texas Department of Family and Protective Services (the Department) that appellant had never hit her. Tina explained that appellant engaged in periods of assault and violence, followed by displays of affection, and then eventually the violence would begin again. She informed the jury that "[i]t has always been like that even through this divorce."

## C.     Tommy Elijah Cabello Jr.

Tommy Elijah Cabello Jr. (Elijah), who was fifteen years old at the time of trial, presented testimony corroborating some of Tina's allegations. Elijah first testified regarding the incident that occurred in June of 2016 around the Father's Day weekend at a hotel. Elijah testified, "[T]hroughout the day we were attempting to get away from my dad because he was being somewhat violent." Elijah testified that after his father entered the hotel room, there was a verbal argument, and then "my dad attempted to push my mom off the balcony." Elijah testified that he "succeeded" in preventing appellant's attempts to push Tina toward the balcony.

Elijah next described the September 2016 incident regarding the celebration at a hotel. Elijah testified that they were driving home from the party at the hotel when his parents began arguing. He "sense[d] that something bad [was] going to happen," so he began recording their interaction with his cellphone. He testified that he saw "my dad smack my mom thrice on the back of the head and two other places on her left side of the

head."

Finally, with regard to the incidents that occurred on November 25, 2018, Elijah testified that he overheard "some argument with [his] dad and mom so [he] stayed on guard in a kind of out[-]of[-]sight corner of the house's hallway." He "peeked," saw that appellant had "cornered," his mother, and saw her try to walk away from appellant. Appellant then "grab[bed] her by the arms and kind of twist[ed] her." Tina asked Elijah to call 911, and he locked himself in the bathroom and did so. He agreed that when his father grabbed his mother and "swung [her] around," it was "definitely" forceful and hard. Half an hour later, Elijah examined his mom and saw "discoloring" on her skin—not bruising—"but not skin as normal."

On cross-examination, Elijah stated that his 911 call to the police was true and accurate except for his name "due to the complexity of the name." In that call, he told the police that "[i]t was purely hand work as in only hands were being used to carry out the attack." He overheard his mother tell his father that she had a bruise and also relayed that information in the 911 call. Elijah testified that he has not seen his father since that incident.

## D.     Detective Joshua Sorensen

Detective Joshua Sorensen, an RPD narcotics detective, testified that he was working overtime and responded to a call regarding a "[d]isturbance in progress with a mother and father," called in by their son on November 25, 2018, as "routine back up." Dispatch identified the caller as "Tommy Cabello[] Jr.," and Detective Sorensen was familiar with appellant as a fellow police officer but did not consider him a personal friend.

16

Detective Sorensen testified that he arrived at the couple's home at the same time that Officer Armstrong and another officer arrived. Detective Sorensen spoke with appellant, who was standing in the front yard near a truck. Detective Sorensen stated that appellant looked anxious, and "[i]t looked like he was waiting for us." Detective Sorensen testified that the couple was separated at the time, and appellant told him that he was "only staying there for a few days," and "[t]hey were attempting to work things out." During the conversation, appellant mentioned that he had a girlfriend.

Detective Sorensen testified that Officer Armstrong took the lead in investigating the disturbance, and Officer Armstrong began speaking with appellant. Detective Sorensen then went towards the garage of the home, and Tina and her son greeted him at the door. Detective Sorensen testified that the son "was standing by his mother and looked scared." Detective Sorensen asked if everything was all right, and queried what had happened, and Tina told him that she was "scared," appellant "grabbed" her, she wanted appellant to retrieve his clothes, and she "just want[ed] him out of here." Detective Sorensen explained that he did not interview anyone else at the scene.

Tina told Officer Armstrong that she did not want to press charges and she did not want anything recorded. Detective Sorensen agreed that it was "common" for an alleged victim of family violence to call the police in a domestic disturbance but then protect the person that committed the violence. He examined Tina's arms where she said appellant grabbed her, but he did not see any visible marks; "there was nothing there." In hindsight, he agreed that it would have been prudent to interview the person who called 911 and record an interview if it was critical.

17

**E.    Lieutenant Enrique Paredez Jr.**

Lieutenant Enrique Paredez Jr. of RPD testified that he serves the department directly under the Chief of Police. He attended the academy with appellant, has known him for more than twenty-two years, and they have a "working relationship." Lieutenant Paredez testified that appellant called him around 2:00 p.m. on November 25, 2018, and told him that "he had been involved in an altercation with his wife and that he had an audio that he needed to provide to law enforcement." According to Lieutenant Paredez, appellant called him directly and told him that he had initially called the police department but could not reach the officers that were involved in the incident. Appellant asked if they could meet so that appellant could give Lieutenant Paredez the recording. "He told me because there was an altercation, there had been a report[,] and it was more than likely going to be reported to the Corpus Christi Police Department." Thus, Lieutenant Paredez confirmed that appellant "had knowledge of a report" and "had knowledge of an investigation ongoing."

Lieutenant Paredez testified that he was aware of the incident prior to appellant's phone call because the police chief and two lieutenants had received an email summary of the night's incidents, and he recognized the address as appellant's residence from personal knowledge and from the "history of the house," which included "the history from previous incidents, reports made by him or his wife."

Lieutenant Paredez and appellant agreed to meet at the L&M Store in Banquete, Texas. It was a Sunday, which was Lieutenant Paredez's day off work, and Lieutenant Paredez "went out of [his] way to help [appellant] out." They met in appellant's truck, and

18

Lieutenant Paredez asked appellant to email the audio recording to him so that he could provide it to the investigator in charge of the case, but appellant said that he could not do so "because the file was too big." Lieutenant Paredez thus recorded the audio statement on his phone.

Lieutenant Paredez ultimately assigned the case to Detective Martin Flores and gave Detective Flores his phone "so he could download [the audio recording] to the server." Lieutenant Paredez testified that when appellant gave him the audio recording, he "thought it was an open and shut case." From his perception of listening to the audio recording of the statement, Tina "was basically stating on the recording that she had made up the assault." He viewed the statement as "exculpatory evidence for the [d]efense." Lieutenant Paredez acknowledged he could have asked appellant to go to the police station and take a statement from him regarding the recording but did not. Lieutenant Paredez denied that he interviewed appellant about the incident and stated that he "absolutely" did not obtain a narrative from appellant about the situation. Lieutenant Paredez confirmed that he planned to provide the recording to the district attorney "to kill the case" against appellant.

Lieutenant Paredez denied that he had any awareness that appellant had a hostile relationship with the current chief of police and mayor of Robstown, but he was aware that appellant had run for the position of mayor against the current mayor, who had appointed the current police chief. Lieutenant Paredez further acknowledged that appellant had executed a search warrant on Lieutenant Paredez's now-deceased brother-in-law, but Lieutenant Paredez denied that appellant's actions with regard to that search

warrant had any effect on his actions with regard to this case.

## F.    Detective Martin Flores

Detective Martin Flores testified that Lieutenant Paredez assigned him to investigate the November 25, 2018 incident the day after it occurred. His assignment to the case was routine and was not different from any other assignment. Detective Flores attempted to contact Tina that day. She did not respond, and Detective Flores did not contact the minor child about the incident. Shortly thereafter, Lieutenant Paredez advised Detective Flores that he had obtained a "phone recording" from appellant and wanted to provide the recording to Detective Flores so that he could enter it into the case as evidence. Detective Flores listened to the recording, and "put the recording into our server to save it for the record." According to Detective Flores, "[a]t that point in time, I thought that the case was not going to proceed." He took the case file to the district attorney's office for review, and the district attorney's office told him to "take the case back to the police department and gather up any other police reports from prior incidents and to return." He never met with Tina, and Tina ultimately provided her own recordings to Detective Armando Lopez.

According to Detective Flores, Detective Lopez saved all the recordings into the server "to preserve [them] as evidence." "At that point in time, contact was already being made with the District Attorney's Office at which point [Detective Flores] was advised that new additional charges were going to be filed." Detective Flores denied that "the upper echelon of [the] Robstown Police Department target[ed appellant] in any way."

Detective Arturo Gonzalez advised Detective Flores that Tina was scheduled to come to the police department for an interview on December 6, 2018. She rescheduled the meeting for December 10, 2018, but she did not show up for that appointment. Detective Flores ultimately interviewed Tina on December 21, 2018. Detective Flores activated his body camera to record the interview in accordance with a standard practice required by the district attorney's office regarding any contact made during an investigation. He met with Tina again on January 7, 2019, to further discuss the recordings. Detective Flores testified that it would have been important to his investigation to know that Tina knew that the audio recordings were being made and that Tina, in exchange, asked appellant to make a recording.

## G. Detective Armando Lopez

Detective Armando Lopez with the Robstown Police Department testified that Tina had come to the police station on December 19, 2018, to give a statement regarding an unrelated matter, and told him she had something to give Detective Flores, who was out at training. Detective Lopez confirmed that this would be acceptable with his supervisor, and Tina gave Detective Lopez a statement regarding the family assault and provided him with audio recordings made the night of the incident, including one in which appellant told Tina to fabricate a statement and a recording. Detective Lopez testified that in the audio recording that he heard, appellant was pressuring Tina into making a false statement for the criminal investigation.

## H. Officer Carlos Pena

Officer Carlos Pena, retired from the RPD at the time of trial, and who had served

as Chief of the Police for Robstown for five years, testified that he was on duty on August 15, 2010, and responded to a disturbance call at appellant's and Tina's residence that day. He was met outside by Officer Lance Davalos, who informed him that "Lerma was accusing [appellant] of hitting her." Pena testified that he went inside the house and saw a flat screen television in the living room showing a "live" display of the front of the house and the vehicles parked outside. Pena confirmed that he saw "live footage from a security camera" that day. Pena testified that he asked appellant if the video surveillance camera was recording, and appellant told him "it was only for viewing." Pena acknowledged that Lerma had previously been arrested and charged with dealing drugs.

## I.    Randy Wilbanks

Randy Wilbanks, who presently owns his own businesses, testified that on August 15, 2010, he worked for Dynamark Security (Dynamark), which provides alarm, camera, and fire systems. He was familiar with the Cabello residence, and testified that Dynamark installed a hard-wired camera system with a DVR there "many years ago." He explained that a DVR is necessary to display images from a security camera on a television and explained that if a police officer saw security camera images on the Cabello's television on August 15, 2020, then a DVR was necessarily present at that time.

Wilbanks testified that on August 19, 2010, a police officer called him and asked about the necessity of a DVR in this situation, and he told them that if there was a video image displayed on the television, then the DVR was present. On cross examination, Wilbanks conceded that a "multiplexer" with a separate power supply would allow a live image to display. Wilbanks was unaware if the Cabellos had installed a multiplexer but

22

testified that he did not see one in the photographs admitted at trial of the television, wires, and entertainment system.

## J. Rebecca Campbell

Rebecca Campbell, a licensed marriage and family therapist, testified that she met with Tina on February 29, 2016, and met individually with the three children in March of that year. She had been asked by the family to see if the children had experienced stress or trauma related to an incident that occurred at Thanksgiving the year before. On March 16, 2016, Campbell met with appellant and Tina to review the results of meeting with the children. In her opinion, the children did not "outcry any distress and did not show any anxiety or fear." Campbell further testified regarding the incident that occurred at Thanksgiving. According to Campbell, Tina told her that "[m]y cousin came at my husband and my sister broke a bottle on my husband's head."

Campbell again met with Tina and appellant, separately, in 2019 pursuant to a mediated settlement agreement for the parties' divorce under which she was appointed to facilitate visitation between the couple's children and appellant. Campbell had set three different appointments to meet with the children which had not yet occurred, and which had been cancelled by Tina.

Campbell testified that she was not asked for an opinion regarding whether or not appellant abused Tina or their children. Campbell agreed that it was common for victims of domestic violence to protect the persons abusing them. She described a cycle of violence where, after an incident of domestic violence, the victim is won back with expressions of love and affection, the couple enjoys a "honeymoon" period where things

are going well, and then another episode of violence occurs.

## K.    Nancy Cantu

Nancy Cantu, appellant's mother, testified that she did not like Tina. She attended the couple's first wedding, but not their second. Cantu had personal knowledge that appellant had an extramarital affair beginning in August of 2018 with DeLeon, another police officer. Cantu liked DeLeon, socialized with her, and encouraged DeLeon to post photographs of their interactions on social media because she did not like Tina. According to Cantu, DeLeon sent the photos to appellant's social media account, and Cantu testified that Tina had access to that account.

Cantu believed that Tina stopped allowing her to see the couple's children after seeing one of the photographs. Cantu testified that a photograph showing sexual activity between appellant and DeLeon was sent by a social messaging service specifically so that Tina could see it.[2] Cantu testified that appellant and DeLeon are no longer dating. According to Cantu, appellant wanted to reunite with Tina for the children's sake.[3]

## L.    Kim Frost

Kim Frost, a family law attorney, testified that she represented Tina with regard to services requested by the Department in approximately January of 2016. Appellant was represented by separate counsel with regard to the request for services. Frost recalled

---

[2] On a tangential issue, Cantu testified that one of her daughters lost custody of a child, and the father of the child had custody. DeLeon located the child and contacted Cantu to inform her of her whereabouts. Cantu denied asking DeLeon to do so and denied that DeLeon "posed as a CPS officer" to find the child.

[3] At this point in the proceedings, the defense made an offer of proof regarding witness Sid Arismendez. The trial court excluded this witness's testimony, and appellant asserts no error in this regard, so we do not address that testimony here.

that the Department became involved with the family because there was an altercation in their home between appellant and the Rio Bravo Police Chief, who was one of Tina's relatives. Frost believed that Tina told her that she had gone to the store with this individual, and the altercation ensued upon returning to the house. According to Frost, Tina told her that her relative was the aggressor in the dispute. Frost explained that the Department was involved at that time because the couple's children were home during the incident, and an affidavit filed regarding this matter "also alleged something about a handgun being pointed at [Tina] by [appellant]," and "that he had threatened to kill her and the children and had been violent with her in the past." Frost testified that Tina told her "that those things did not happen," and "she was in a relationship with [appellant]." On a separate topic, Frost explained that both of the parties' divorces had been or were being resolved on grounds of "insupportability," or no fault, and stated that the grounds for a divorce can affect the amount of spousal support.

**M.	Larry James Adams**

Larry James Adams, an attorney, testified that he represents appellant in the current divorce proceedings pending between appellant and Tina. Appellant told him that he never "effectuated" the 2012 divorce, and the couple stayed together after the divorce. Adams stated that the provisions from the 2012 divorce were not completed. For example, title to the house was not transferred to Tina, and appellant's retirement was not divided between appellant and Tina.

In the current divorce proceeding, Adams has asked for an amicus to be appointed for the children, although Tina opposed this request as unnecessary and a waste of

25

resources because appellant was in arrears on child and spousal support. Adams testified that Tina had propounded discovery to appellant regarding property division, but none of the discovery requests addressed issues regarding the children or violence. Adams recounted that appellant and Tina had successfully mediated their claims against each other in the divorce, and their mediated settlement agreement recited "insupportability" or "no fault" as the reason for the divorce, rather than cruelty or adultery. Adams explained that as part of the agreement, the protective order against appellant will be dismissed and replaced by a civil injunction against appellant. According to Adams, Campbell was working to adapt appellant to the standard possession order for the children, because the children had not seen appellant in some time.

## N.    Officer Leo Champion

Officer Leo Champion of the RPD testified that he was dispatched to the Cabello residence for a "standby," which he explained as the exchange of the children between appellant and Tina, on December 19, 2018. He did not know who called him, and his role was to make sure that the exchange went well. According to Officer Champion, there were no problems that night, but the exchange did not happen. Appellant advised Officer Champion that he had an order allowing him to take the children, but Tina refused to transfer possession of the children to appellant. Tina provided Officer Champion with a Department Safety Plan. Officer Champion testified that DeLeon accompanied appellant to pick up the children.

## O.    Johnny Marquez

Johnny Marquez, an adult probation officer for Nueces County, testified that he

acts as a liaison between the court and the probation office and is familiar with this case. He discussed appellant's "Order Imposing Conditions of Bail Pending Trial," and testified that it prevented appellant from contacting Tina or his children.

## P. Conclusion

The parties rested and the case was submitted to the jury, who found appellant guilty on all three counts. Appellant elected to have the court assess his punishment, which after additional testimony, sentenced appellant to ten years of imprisonment. This appeal followed.

## II. PRESERVATION OF ERROR REGARDING EXTRANEOUS OFFENSE EVIDENCE

Appellant's first two issues concern the admission of evidence regarding extraneous offenses. In his first issue, appellant asserts that "the trial court abused its discretion in admitting the State's extraneous [offense] evidence surrounding the assault of [Lerma] and the subsequent investigation." In his second issue, appellant asserts that the admission of "many" incidents of "bad acts" violated Texas Code of Criminal Procedure article 38.371(c) and Texas Rule of Evidence 404(b)(1). *See* TEX. R. EVID. 404(b); TEX. CODE CRIM. PROC. ANN. art. 38.371(c). The State contends in part, that appellant has failed to preserve error regarding these issues. We address the applicable law and relevant background.

## A. Applicable Law

"Preservation of error is a systemic requirement on appeal." *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009); *see Sandoval v. State*, 409 S.W.3d 259, 287 (Tex. App.—Austin 2013, no pet.). A reviewing court should not address the merits of an

27

issue that has not been preserved for appeal. *Wilson v. State*, 311 S.W.3d 452, 473 (Tex. Crim. App. 2010) (per curiam) (op. on reh'g) (quoting *Ford*, 305 S.W.3d at 532). Generally, to preserve error for appellate review, the record must show that an objection was made to the trial court, the grounds for relief were made "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context," and the trial court ruled upon the objection. TEX. R. APP. P. 33.1(a); *see Gibson v. State*, 541 S.W.3d 164, 166 (Tex. Crim. App. 2017); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). "Magic words are not required . . . ." *Gonzalez v. State*, 616 S.W.3d 585, 591 (Tex. Crim. App. 2020), *cert. denied*, 142 S. Ct. 436 (2021). "A complaint is obvious if there are 'statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be.'" *Id.* (quoting *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012)). Further, the contention on appeal must comport with the objection made at trial, otherwise, "nothing is presented for review." *Hallmark v. State*, 541 S.W.3d 167, 171 (Tex. Crim. App. 2017); *see Thomas*, 505 S.W.3d at 924; *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

In terms of evidentiary matters, a motion in limine "is a preliminary matter and normally preserves nothing for appellate review." *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008). "For error to be preserved with regard to the subject of a motion [in limine], an objection must be made at the time the subject is raised during trial." *Id.* More specifically, to preserve error regarding the admission of evidence, a party must object each time the inadmissible evidence is offered, obtain a running objection, or request a hearing outside the presence of the jury. *See Martinez v. State*, 98 S.W.3d 189,

193 (Tex. Crim. App. 2003); *Bleimeyer v. State*, 616 S.W.3d 234, 250 (Tex. App.—Houston [14th Dist.] 2021, no pet.); *see also* TEX. R. EVID. 103(b) (providing that a party need not renew an objection when it is made outside the presence of the jury); *Geuder v. State*, 115 S.W.3d 11, 13–14 (Tex. Crim. App. 2003); *Gillum v. State*, 888 S.W.2d 281, 285 (Tex. App.—El Paso 1994, pet. ref'd) (holding that the appellant did not preserve an objection when it was made during a hearing outside the presence of the jury as to one witness but was not raised when similar testimony was elicited from another witness).

The court of criminal appeals has held that running objections "have a legitimate function" in certain situations because they "promote the orderly progression of the trial," and prevent disruption caused by repeated objections. *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991) (en banc) (discussing and quoting *Sattiewhite v. State*, 786 S.W.2d 271, 283–84 & n.4 (Tex. Crim. App. 1989)). A running objection should be timely and state the specific grounds for the requested ruling if the grounds were not apparent from the context. *Id.* at 859. A party requesting a running objection "should take pains to make sure it does not encompass too broad a reach of subject matter over too broad a time or over different witnesses." *Id.* (discussing *Goodman v. State*, 701 S.W.2d 850, 863 (Tex. Crim. App. 1985) (en banc)). Nevertheless, a properly framed running objection can extend to testimony by all witnesses pertaining to the same type of evidence. *Ford v. State*, 919 S.W.2d 107, 113–14 (Tex. Crim. App. 1996) (en banc) (holding that a running objection "as to any and all impact evidence" as "to all witnesses" testifying to such was sufficient to preserve error regarding the testimony of other witnesses pertaining to the same type of evidence); *Walker v. State*, 406 S.W.3d 590,

29

599 (Tex. App.—Eastland 2013, pet. ref'd) ("The running objection contextually covers the testimony of Officers Luckie and Miller, based on the charges not pursued in Hood County."); *Stafford v. State*, 248 S.W.3d 400, 410 (Tex. App.—Beaumont 2008, pet. ref'd) (concluding that a running objection to one witness's testimony did not preserve error as to others because "the record does not indicate [that counsel] requested that his running objection be applied to all witnesses"); *Scaggs v. State*, 18 S.W.3d 277, 292–93 (Tex. App.—Austin 2000, pet. ref'd) (concluding that error was not preserved where "[a]ppellant did not ask for his [running] objection to apply to the testimony of other witnesses"); *White v. State*, 784 S.W.2d 453, 458–61 (Tex. App.—Tyler 1989, pet. ref'd) (concluding that error was not preserved where the running objection did not encompass other witnesses).

## B.    Background

The parties addressed the admissibility of evidence at a pretrial hearing on appellant's motion in limine and again at various instances during trial. Appellant's motion in limine requested the court to instruct the State and its witnesses to refrain from mentioning specified matters "without first approaching the Bench and obtaining a ruling from the Court outside the presence" of jurors. The motion in limine identified one such matter as:

> Any unadjudicated prior, contemporaneous[,] or subsequent bad acts or specific instances of character evidence conduct of [appellant] without first having a hearing outside the presence of the jury to determine whether said acts or instances of conduct are: 1) admissible under the balancing test of [Texas Rule of Evidence] 403, and 2) in fact offered for a reason other than to prove conduct in conformity under [Texas Rule of Evidence] 404(b). This request includes, but is not limited to, prior allegations of family violence by [Tina] against [appellant].

In this regard, the State filed a "Notice of Intention to Use Extraneous Offenses and Prior Convictions," detailing thirty separate extraneous offenses, which provided the foundation for much of the discussion at the pretrial hearing on the motion in limine.[4]

At the pretrial hearing, the State requested the trial court to allow all of the extraneous offenses identified in the notice into evidence under Texas Rule of Evidence 404(b) as indicative of a "pattern" or as relevant to show the parties' relationship under article 38.371. In general, the State argued that these incidents were relevant to both the family violence and tampering charges because they indicated appellant's power over Tina and a pattern whereby he assaulted her, she accused him of the assault, he convinced her to retract the accusation, and she changed her story. The State argued, generally, that the extraneous offense evidence was relevant and admissible because, inter alia, the appellant was defending the charges against him on the basis that Tina was lying about the events at issue.

In discussing the extraneous offenses, appellant's counsel interjected that "there can be admissible 404(b) things with pattern[,] practice[,] and behavior," and stated that, "What I want to do is just have a hearing outside the presence [of the jury] to determine if [the State] can meet that predicate before it comes straight in front of the jury." The trial court responded by stating, "[T]hat's what we're doing right now, right?" The State confirmed, "That's what I am trying to do, yes."

---

[4] Another topic in the motion in limine was: "Any otherwise inadmissible evidence of the 'nature of the relationship between the actor and the alleged victim' mentioned in Texas Code of Criminal Procedure [article] 38.371, as [appellant] is indicted under Texas Penal Code § 25.11, which is not a predicate offense authorized by [article] 38.371."

31

The parties discussed each of the items on appellant's motion in limine and did so in connection with the offenses listed in the State's notice. During the pretrial hearing, appellant did not lodge objections to each of the extraneous offenses. For instance, appellant did not object to the 2010 incident when appellant pulled Tina from her vehicle by her hair and dragged her into the house because it was a charged offense, and appellant argued that it would be useful to assail Tina's credibility because she told the grand jury that the incident did not happen. The trial court made its rulings as to each on the record. With a few exceptions, the trial court generally ruled that it was "allowing" the extraneous offenses. During the hearing, appellant's counsel stated that "what I anticipate is that I will be making a formal trial objection on [article] 38.371 and on [Rule] 404(b) at the time of trial, but for purposes of limine-type things, I don't have an objection."

During the pretrial hearing, the State argued that the incident with Lerma "goes to one of [appellant's] instances of tampering with evidence having to do with the video recorder," and asserted that appellant had been indicted for tampering with evidence. Appellant's counsel responded as follows:

> And—and, Your Honor, I disagree with that because you don't have the same issue with the Courts taking under advisement under [article] 38.371. It's not a family violence issue. It is not a pending case. It is not a conviction. It is not anything where we have the same even factual scenario here that we had there. What we're talking about here in this case is actually creating a recording, not doing anything with getting rid of anything.

In further argument, the State contended that "[i]t shows a pattern of being willing to destroy evidence and tamper with evidence, and it's similar enough." The State also asserted that it was relevant to issues pertaining to Tina's credibility, specifically with regard to instances where she stated that appellant assaulted her, then later withdrew the

allegation. The court said that it was "going to allow it."

The parties further discussed the incident wherein appellant struck Lerma, told Tina not to come home, told the police that they no longer had a DVR, and hid the DVR in the attic. Charges were pressed against appellant with regard to the assault. Appellant's counsel informed the court that he was "not going to have an issue" with that, "because on the other side of the coin, we'll hear evidence that [Lerma] always blamed [appellant] for sending her to prison when she was caught multiple times dealing drugs in Robstown." The trial court stated that she was "allowing the August 15, 2010 incident with [Lerma]."

The State argued that the evidence regarding the DVR was relevant and admissible because appellant had been indicted for tampering with evidence, evidence pertaining to the DVR "goes to one of [appellant's] instances of tampering with evidence," "[i]t shows a pattern of being willing to destroy evidence and tamper with evidence," and it is "similar enough" to the incidents in the indictment. The State further argued that the DVR evidence was relevant to issues pertaining to Tina's credibility. In this regard, the State argued that appellant told Tina "that he had to put the DVR in the attic, which is a party admission," and told "Tina to say the DVR was broken a few months back, which is, again, consistent with this case where he's having to make false statements to get out of trouble." Appellant's counsel stated that he "would object for the record under the same bases that [he] did on the other tampering issues." The trial court stated that it "would allow it for the same reasoning."

33

In opening statements at trial, appellant's counsel argued that appellant had been unfaithful to Tina since 2010, and in November 2018, Tina was aware of appellant's affair with DeLeon. He characterized the case as one about "disrespect." He asserted that appellant and Tina made one of the recordings "[n]ot to falsify things but to bring out the truth" that "there was no assault." Appellant's counsel referenced "incidents of documented lying by Tina," and argued that "Tina really got [appellant] back."

Subsequently, during trial, the State asked Tina, "[f]rom the years of dating from 1997 to 2000, was there ever any instances of violence or family assault type of behavior from [appellant]?" Appellant's counsel stated that he was "going to object to [Rule 404(b)]; and further going to object to the inapplicability of [article 38.371]." The State responded "[W]e have already gone over this on the motion in limine. I think I can show the relationship history." Appellant's counsel asserted that, "Your Honor, I am making my trial objection at this point." The trial court overruled appellant's objection, stating that "[i]t is the same ruling as before." Appellant's counsel then requested, "[f]or record purposes, may I get a running objection as to each incident?" The trial court granted the request for a running objection.

Later at trial, the State questioned Tina about these events and about the August 17 statement that she provided to the police where she stated in summary that Lerma was the aggressor in the fight, that Lerma told her she "was going to have [appellant's] badge," and that if Tina did not leave appellant, that Lerma "will make sure he leaves" her. Tina testified that appellant told her to make the statement that Lerma approached him first "so he could say it was self-defense and he would not get in trouble." She

34

admitted that the parts of the statement identifying Lerma as the aggressor were untrue and that she told the police falsehoods to help appellant. Tina further identified photographs of her home's security cameras, testified that they were working on the date of the incident and captured the incident, and that she saw the video of both assaults. She further identified the television set, with dangling wires, as accurately reflecting the scene after the police executed the search warrant. The State offered the photographs of the television set with dangling wires into evidence. At that time, appellant's counsel stated, "I have no objections. The Court has already ruled on them and giv[en] me a running objection. No further objections, Your Honor." The trial court reviewed the photographs and admitted them.

The State then asked Tina if she understood that appellant was "now saying that what you, in fact, said in that statement is true and that this never happened[?]" Appellant's counsel requested to approach the bench, where he argued that this question constituted a "comment on his failure to testify," "[w]hich is a Fifth Amendment issue." Appellant's counsel requested a mistrial, which was denied.

## C.    Analysis

We examine whether appellant has preserved error regarding the admission of the extraneous offense evidence. We conclude, first, that appellant's motion in limine did not preserve error as to the admission of evidence regarding extraneous offenses because a motion in limine does not, in itself, preserve error. *See Fuller*, 253 S.W.3d at 232.

We next consider whether the pretrial hearing constituted a hearing regarding "objections outside the presence of the jury" under Texas Rule of Evidence 103, such that

35

appellant did not need to renew any objection at trial to preserve a claim for appeal. *See* TEX. R. EVID. 103(b). Based on our review, appellant did not file a motion requesting a Rule 103 hearing on his objections outside the presence of a jury, and appellant's motion in limine did not request the exclusion of evidence. *See Norman v. State*, 523 S.W.2d 669, 671 (Tex. Crim. App. 1975) (describing the purpose of a motion in limine). At the pretrial hearing, appellant discussed his request to address matters outside the presence of the jury, which appears to invoke Rule 103, and the trial court's frequent ruling that she would "allow" the extraneous offenses implies an evidentiary ruling. *See Smith v. State*, 424 S.W.3d 588, 593 (Tex. App.—Texarkana 2013, no pet.) (concluding that when a defendant makes a Rule 403 objection before opening statements, a trial court's ruling that it is "going to allow" the evidence constitutes a ruling under Rule 103(b)); *see also Foreman v. State*, No. 14-21-00076-CR, 2022 WL 1041133, at *2–3 (Tex. App.—Houston [14th Dist.] Apr. 7, 2022, no pet.) (mem. op., not designated for publication) (concluding that an objection to the admission of evidence preserved error even though titled as a motion in limine). Nevertheless, at that same hearing, appellant's counsel expressed his intent to later present "a formal trial objection on [article] 38.371 and on [Rule] 404(b) at the time of trial," and at trial, requested a running objection. These factors militate against concluding that the pretrial hearing constituted a Rule 103 hearing. Considering all of these circumstances, we conclude that there was not an objection and hearing held outside the presence of the jury such that appellant's counsel was relieved of the obligation to object at trial to the extraneous offense evidence. We turn our attention to the running objection lodged by the defense.

36

The State contends that the running objection was offered only as to acts of violence committed between 1997 and 2000, and appellant did not request his running objection to apply to later events or other witnesses. At trial, appellant's counsel objected to the question posed to Tina regarding "instances of violence or family assault type of behavior" from 1997 to 2000 on Rule 404(b) grounds and "the inapplicability" of article 38.371. The State asserted that they had "already gone over this on the motion in limine" and the extraneous offense evidence showed the parties' relationship history. Appellant's counsel stated he was "making [his] trial objection at this point," the trial court made "the same ruling as before," and appellant's counsel requested "a running objection as to each incident," which the trial court granted.

Subsequently, at trial, Tina identified photographs of her home's security cameras, testified that they were working on the date of the incident and captured the incident, and that she saw the video of both assaults. She further identified the television set, with dangling wires, as accurately reflecting the scene on the date of the search warrant. The State offered the photographs of the television set with dangling wires into evidence. At that time, appellant's counsel stated, "I have no objections. The Court has already ruled on them and giv[en] me a running objection. No further objections, Your Honor." The trial court reviewed the photographs and admitted them.

Based on the foregoing, we conclude that the legal bases for the running objection, Rule 404(b) and article 38.371, were obvious to the court and to opposing counsel, and there are statements and actions evident in the record that "clearly indicate what the judge and opposing counsel understood the argument to be." *Ex parte Nuncio*, No. PD-0478-

19, 2022 WL 1021276, at *3 (Tex. Crim. App. Apr. 6, 2022) (quoting *Clark*, 365 S.W.3d at 339). The parameters of the factual bases for running objection as to "other incidents" is less clear regarding whether the "other incidents" encompass periods of time beyond 1997 to 2000 or encompass offenses of instances of tampering in addition to offenses regarding family violence. Appellant's counsel clearly believed his objection encompassed all extraneous offenses, no matter the time period and no matter the subject, insofar as he stated that he had already been granted a running objection regarding the "tampering" photographs which occurred in 2010, and his belief was not corrected on the record when expressed.

We conclude that appellant's objection to "other incidents" was specific enough to preserve appellant's complaints regarding the extraneous offense evidence. *See Ford*, 919 S.W.2d at 113–14. However, appellant did not request that his running objection extend to extraneous offense evidence presented by other witnesses. *See id.* We review appellant's evidentiary issues accordingly.

### III.    EVIDENTIARY ISSUES

We turn our attention to appellant's first two issues concerning the admission of evidence regarding extraneous offenses. In his first issue, appellant asserts that "the trial court abused its discretion in admitting the State's extraneous [offense] evidence surrounding the assault of [Lerma] and the subsequent investigation." In his second issue, appellant asserts that the admission of "many" incidents of "bad acts" violated Texas Code of Criminal Procedure article 38.371(c) and Texas Rule of Evidence 404(b)(1). *See* TEX. R. EVID. 404(b); TEX. CODE CRIM. PROC. ANN. art. 38.371(c).

38

## A.    Standard of Review

We review the determination to admit or exclude evidence under an abuse of discretion standard. *Valadez v. State*, No. PD-0574-19, 2022 WL 946268, at *4 (Tex. Crim. App. Mar. 30, 2022); *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). "There is no abuse of discretion if the trial court's ruling is within the zone of reasonable disagreement." *Valadez*, 2022 WL 946268, at *4; *see De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). "A decision to admit extraneous misconduct evidence is within that zone if the evidence is relevant to a material, non-propensity issue, and its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *Valadez*, 2022 WL 946268, at *4; *see De La Paz*, 279 S.W.3d at 344.

## B.    Relevance

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401; *see Gonzalez*, 616 S.W.3d at 594. A trial court may not admit irrelevant evidence. TEX. R. EVID. 402. There must be a "direct or logical connection" between the evidence and the fact that the proponent is trying to prove. *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021) (quoting *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009)). "The relevance of evidence is not always clear cut, and reasonable people may disagree about whether certain evidence leads to a particular inference." *Id.* "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:

unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. In performing a Rule 403 analysis, a court must balance the following non-exclusive factors: "(1) how probative the evidence is[;] (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019); *see Inthalangsy*, 634 S.W.3d at 758; *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Montgomery v. State*, 810 S.W.2d 372, 389–90 (Tex. Crim. App. 1990) (op. on reh'g).

## C.    Extraneous Misconduct

Under Texas Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). The purposes listed in the rule for which such evidence may be admissible "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. "Rule 404(b) is a rule of inclusion rather than exclusion." *Id.* (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). "The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id.*

40

The Texas Court of Criminal Appeals recently explained the law pertaining to character evidence and evidence of extraneous conduct as follows:

> Character evidence is generally inadmissible because it may "weigh too much with the jury" and encourage it "to prejudge one with a bad general record and deny him the fair opportunity to defend against a particular charge." It is inadmissible "to prove that on a particular occasion the person acted in accordance with the character or trait." Specifically, "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." This rule prohibits admission of evidence to prove a person's character "from which the trier of fact is then to infer that the person acted in conformity with that character trait on the occasion in question."

> "[T]he propensity to commit crimes is not a material fact in a criminal case[.]" But extraneous misconduct evidence may "be admissible if [it] is logically relevant to prove some other fact" than character propensity. Evidence of extraneous misconduct must tend to enhance or diminish the probable existence of a fact of consequence in the case. Even "a small nudge toward proving a fact of consequence" satisfies relevancy.

> A fact of consequence may be "either an elemental fact or an evidentiary fact from which an elemental fact may be inferred." Extraneous misconduct evidence may be admissible to rebut a defensive theory that negates an element of the charged offense.

> Similarity is crucial to the doctrine of chances.[5] The admissibility of evidence under the doctrine of chances depends on a showing of "highly unusual events [that] are unlikely to repeat themselves inadvertently or by happenstance." In [*De La Paz v. State*, 279 S.W.3d 336 (Tex. Crim. App. 2009)] extraneous drug deals were admissible under the doctrine of chances where the accused police officer defended himself against charges of perjury and tampering with evidence on grounds that he saw things seen by no one else present at the scene. The extraneous drug deals and the one underlying the charged offenses shared distinctive details: De La Paz's confidential informant planted fake drugs near innocent people, but De La Paz recorded in his offense reports that he saw the contact or delivery between the [confidential informant] and the victim, whereas others present did not see the contact or delivery. The repetitions of these "highly unlikely

---

[5] The "doctrine of chances" is defined as "the principle that evidence of the repetition of similar unusual events over time demonstrate a decreasing probability that those unusual events occurred by chance." *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005).

events" were an "extraordinary coincidence" rendering De La Paz's claims about what he saw objectively unlikely.

Extraneous misconduct evidence must be proven beyond a reasonable doubt and by competent evidence. On request, the jury should be instructed that it can only consider extraneous misconduct evidence if (1) it believes beyond a reasonable doubt that the defendant committed such misconduct and (2) then only for the limited purpose for which it was admitted. The failure to request a limiting instruction when the evidence is admitted will relieve the trial court of its duty to give the instruction in the written charge. But the beyond-a-reasonable-doubt instruction relative to extraneous offenses must be included in the written charge if it is requested at that point.

Evidence of extraneous misconduct that is admissible under Rule 404(b) may be inadmissible under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." The particular phrases implicated here are "probative value," "unfair prejudice," and "misleading the jury."

"'[P]robative value' means more than simply relevance." It instead "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." If the proponent "has other compelling or undisputed evidence" to prove the fact, then the item's probative value "will weigh far less than it otherwise might in the probative-versus-prejudicial balance."

"Unfair prejudice" means "a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Evidence may be unfairly prejudicial if it prompts "the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence."

"Misleading the jury" means a risk that the evidence would be given undue weight for reasons other than emotional ones; an example is scientific evidence that a jury is not equipped to judge.

In sum, as pertinent here, a court must balance the probative force of the proffered evidence and the proponent's need for it against any tendency of the evidence to suggest decision on an improper basis and any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate its probative force. Rule 403 requires the exclusion of relevant evidence only when there is a clear disparity between its probative

value, on the one hand, and its prejudicial or misleading effect, on the other.

*Valadez*, 2022 WL 946268, at *3–4 (internal citations and parentheticals omitted).

**D.     Article 38.371(c)**

Article 38.371(c) concerns the admissibility of evidence in the prosecution of an offense committed against a member of the defendant's family, household, or a person in a dating relationship with the defendant. *See* TEX. CODE CRIM. PROC. ANN. art. 38.371. It provides:

(a)     This article applies to a proceeding in the prosecution of a defendant for an offense, or for an attempt or conspiracy to commit an offense, for which the alleged victim is a person whose relationship to or association with the defendant is described by [§§] 71.0021(b), 71.003, or 71.005, Family Code.

(b)     In the prosecution of an offense described by Subsection (a), subject to the Texas Rules of Evidence or other applicable law, each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense described by Subsection (a), including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim.

(c)     This article does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law.

*Id.* "Thus, Article 38.371(b) expressly allows [extraneous offense] evidence regarding the nature of the relationship between an accused and a complainant." *James v. State*, 623 S.W.3d 533, 546 (Tex. App.—Fort Worth 2021, no pet.). In summary:

Areas of relevant and admissible [extraneous offense] evidence that complies with article 38.371 include evidence that: (1) explains why a victim of domestic violence is unwilling to cooperate with prosecution; (2) confirms the victim's initial—and later recanted—statements to police; or (3) contextualizes the nature of the relationship between victim and assailant.

43

*Fernandez v. State*, 597 S.W.3d 546, 566 (Tex. App.—El Paso 2020, pet. ref'd) (collecting cases); *see, e.g.*, *Brickley v. State*, 623 S.W.3d 68, 81 (Tex. App.—Austin 2021, pet. ref'd) ("In light of the testimony above, the evidence regarding a prior incident of abuse similarly motivated by jealousy and involving use of a deadly weapon was probative because it contextualized the nature of the relationship between Brickley and C.M. and helped explain some of her conduct during the incident and her hesitancy in reporting the offense."); *Gonzalez v. State*, 541 S.W.3d 306, 312 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("The trial court could have concluded that the evidence was admissible to refute appellant's defensive theory that Patty fabricated the assault or that no assault actually occurred."); *Brock v. State*, 275 S.W.3d 586, 589–90 (Tex. App.—Amarillo 2008, pet. ref'd) (reviewing the trial court's decision to admit evidence regarding a tumultuous relationship between the appellant and complainant and concluding that trial court did not abuse its discretion by determining that "the challenged evidence had probative force to explain the relationship between appellant and his wife, and how that relationship motivated her murder").

## E.    Lerma Assault and Investigation

In his first issue, appellant contends that the trial court erred in admitting extraneous evidence regarding the assault of Lerma and the investigation of that assault. The summary of appellant's argument is as follows:

> This evidence, presented in the State's case-in-chief, was that [appellant] had punched [Tina's] sister, [Lerma], outside his residence and hid or destroyed the camera evidence capturing this incident. The State alleged this [404(b)] evidence was to prove the third count of the Indictment. However, Count Three does not allege that [appellant] destroyed evidence.

44

It alleges that he presented false evidence knowing it was false. Therefore, this evidence was irrelevant to any issue in the indictment. [Appellant] asserts that it was meant solely for the character-conformity purpose of showing that [appellant] is a violent, assaultive, person which caused him unfair prejudice, in violation of the Texas Rules of Evidence 401, 403, and 404(b)(1).

Appellant thus argues that evidence that he hid or destroyed a DVR recording was irrelevant to count three of the indictment regarding the false audio recording, which does not involve the destruction of evidence, and even if relevant, this evidence was more prejudicial than probative. In contrast, the State contends that appellant did not timely object to this evidence, so the complaint is not preserved for appellate review; the trial court did not abuse its discretion in admitting this evidence; and even if the evidence was improperly admitted, it was not evidence that warrants reversal because it was cumulative of unobjected-to evidence of other extraneous offenses of assault and tampering.

As stated previously, appellant's objection to extraneous offense evidence regarding the DVR was lodged with regard to Tina's testimony. However, other witnesses testified without objection to this evidence. Pena testified that he saw a flat screen television showing a live display of the front of the house and the vehicles parked outside, expressly confirmed that he saw "live footage from a security camera," asked appellant if the video surveillance camera was recording, and appellant told him "it was only for viewing." Randy Wilbanks testified that he installed a hard-wired camera system with a DVR at the Cabello residence, the DVR required to show captured material on a television screen, and Wilbanks explained that if a police officer saw images on August 15, 2020 from the security cameras, that the DVR was necessarily present at that time. In short, appellant's running objection did not extend to the testimony proffered by witnesses other

45

than Tina, who was on the stand at the time that the objection was lodged. *See Ford*, 919 S.W.2d at 113; *Walker*, 406 S.W.3d at 599; *Stafford*, 248 S.W.3d at 410; *Scaggs*, 18 S.W.3d at 292–93; *White*, 784 S.W.2d at 458–61.

Generally, error in the admission of evidence is considered harmless when other such evidence was received without objection, either before or after the complained-of ruling. *See Coble v. State*, 330 S.W.3d 253, 282 & n.82 (Tex. Crim. App. 2010) (holding that if a party fails to object each time inadmissible evidence is offered, any error in admission of evidence is "cured"); *see also Leday v. State*, 983 S.W.2d 713, 716–21 (Tex. Crim. App. 1998). One exception to this general rule occurs when a defendant offers evidence that is identical to that which he objected to earlier in order to rebut, destroy, or explain the previously admitted evidence. *Leday*, 983 S.W.2d at 718–19; *Rogers v. State*, 853 S.W.2d 29, 35 (Tex. Crim. App. 1993). Other witnesses testified without objection to the DVR evidence, and accordingly, error was not preserved.

Even had error been preserved, however, we would agree with the State that the trial court did not err in admitting this extraneous offense evidence. One of the recognized justifications for the admission of a defendant's extraneous offenses is to rebut defensive theories such as fabrication or retaliation. *See Bass v. State*, 270 S.W.3d 557, 562–63 (Tex. Crim. App. 2008); *Donald v. State*, 543 S.W.3d 466, 482–83 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Sandoval*, 409 S.W.3d at 301. These defensive theories were both presented in the appellant's opening statement. Appellant's actions regarding the DVR, that is, hiding it and instructing Tina to lie about it, also bear on the nature of the relationship between appellant and Tina, wherein appellant denied the existence of family

46

violence and instructed Tina to do so as well, and Tina repeatedly did so because she felt that she was at fault and appellant's job was at stake. *See* TEX. CODE CRIM. PROC. ANN. art. 38.371(b). We overrule appellant's first issue.

## F.     Other Bad Acts

In his second issue, appellant asserts that the admission of "many" incidents of "bad acts" violated Texas Code of Criminal Procedure article 38.371(c) and Texas Rule of Evidence 404(b)(1). Appellant argues that the offenses were remote in time, cumulative, and caused unfair prejudice. Appellant further contends that evidence regarding each incident should have been followed by a limiting instruction. In contrast, the State argues that appellant did not preserve error, the evidence of prior acts is admissible in a family violence case to show the history of the parties, and the evidence was admissible to show Tina's reluctance to cooperate with the police and to rebut the allegation of fabrication.

### 1.     Preservation of Error

We have previously discussed preservation of error regarding extraneous offense evidence. The State again contends that appellant failed to preserve error regarding the extraneous offense evidence. Here, the majority of extraneous offense evidence was offered by Tina, against whose testimony the running objection was lodged. As discussed previously, error was preserved regarding these matters. However, Elijah testified to the extraneous offenses occurring at the hotel near Father's Day weekend and in the family's vehicle leaving a hotel following a celebration. Lieutenant Paredez testified that he recognized the couple's address based on the "history of the house," which included

47

"previous incidents, reports made by him or his wife." Frost testified that, although Tina denied the allegations, an affidavit filed with the Department "alleged something about a handgun being pointed at [Tina] by [appellant]," and "that he had threatened to kill her and the children and had been violent with her in the past." We conclude that error was not preserved as to the extraneous offenses as testified about by these witnesses. *See Coble*, 330 S.W.3d at 282 & n.82; *Leday*, 983 S.W.2d at 716–21. Nevertheless, as further discussed, whether error was preserved or not, the trial court did not abuse its discretion in admitting this extraneous offense evidence.

### 2. Remoteness

Appellant contends that some of the extraneous offense evidence was too remote in time. Appellant does not segregate the offenses by date to assist the court with its resolution of this argument, but does mention "incidences going back to 1997," incidents occurring between 1997 and 2000, and incidents occurring in 2002, 2010, and 2011. Remoteness can significantly lessen the probative value of extraneous offense evidence. *West v. State*, 554 S.W.3d 234, 239 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Gaytan v. State*, 331 S.W.3d 218, 226 (Tex. App.—Austin 2011, pet. ref'd). "Still, remoteness alone does not require the trial court to exclude evidence of an extraneous offense under Rule 403." *West*, 554 S.W.3d at 239; *see Gaytan*, 331 S.W.3d at 226; *see also Price v. State*, 594 S.W.3d 674, 680 n.6 (Tex. App.—Texarkana 2019, no pet.). "Rather, remoteness is but one aspect of an offense's probativeness the trial court is to consider along with the other factors in the Rule 403 analysis." *West*, 554 S.W.3d at 239–40. "[C]ourts have found that even long lapses in time do not deplete the probative value

48

of the evidence." *Parlin v. State*, 591 S.W.3d 214, 224 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (collecting cases involving intervals comprising thirteen years, twenty-six months, and four to seven years); *see Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.—Waco 2009, pet. ref'd) (concluding that the "remoteness of the extraneous[ ]offense evidence significantly lessens its probative value" but finding the twenty-five-year-old extraneous offense evidence admissible). "Evidence showing a 'continuing course of conduct' can militate against a finding that an extraneous offense was too remote to be probative." *Brickley*, 623 S.W.3d at 81 (quoting *Clarke v. State*, 785 S.W.2d 860, 866 (Tex. App.—Fort Worth 1990), *aff'd*, 811 S.W.2d 99 (Tex. Crim. App. 1991)).

We conclude that the remoteness of the extraneous offenses did not render the probative value of this evidence so weak as to render this evidence inadmissible. We note that the Texas Rules of Evidence "favor the admission of all logically relevant evidence for the jury's consideration." *Montgomery*, 810 S.W.2d at 375; *see Price*, 594 S.W.3d at 680.

### 4. Limiting Instruction

Appellant contends that "[t]he trial court failed to give a limiting instruction upon entry of each extraneous evidence" and the trial court's omission constituted an abuse of discretion. During trial, after the State had elicited testimony from Tina regarding the extraneous offense of April 22, 2000, when appellant grabbed her, appellant's counsel requested the trial court to give a limiting instruction, which it did:

> Ladies and gentlemen, you are to consider the prior acts not in the indictment referenced only for the purposes of plans, pattern[,] or habit, and not to show that [appellant] acted in conformity, therewith, on November 25th, 2018. You further may consider these prior unindicted acts to rebut

49

the Defense's theory of fabrication.

Further, the jury charge contained the following instruction:

**Evidence of Wrongful Acts Possibly Committed by Defendant**

During the trial, you heard evidence that the defendant may have committed wrongful acts not charged in the indictment. The state offered the evidence to show that the defendant had a pattern, plan, or to rebut the theory of fabrication. You are not to consider that evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act. Those of you who believe the defendant did the wrongful act may consider it.

Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purpose I have described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider this evidence only for the specific, limited purpose I have described. To consider this evidence for any other purpose would be improper.

Appellant contends that "the court failed to give a limiting instruction immediately after every extraneous offense evidence as required by law." In support of this proposition, appellant cites Texas Rule of Evidence 105 and *Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007). Based on our review, neither source requires this. *See* TEX. R. EVID. 105; *Delgado*, 235 S.W.3d at 251. And in fact, case law holds to the contrary. *See Reeves v. State*, 99 S.W.3d 657, 658–59 (Tex. App.—Waco 2003, pet. ref'd). "There is nothing in the plain language of Rule 105 or the case law that requires the trial court, upon a pre-trial request, to recognize each instance of extraneous offense evidence and deliver a limiting instruction at each instance." *Id.*

5.   **Relevance**

Appellant contends that the extraneous offense evidence lacked any relevance

50

other than character conformity, and thus the evidence should have been excluded. We disagree. First, evidence regarding other assaults and violent acts, and evidence regarding tampering with evidence and witnesses bore on the nature of the relationship between appellant and Tina. *See* TEX. CODE CRIM. PROC. ANN. art. 38.371(b); *see also Miller v. State*, No. 06-20-00015-CR, 2020 WL 4044717, at *2 (Tex. App.—Texarkana July 20, 2020, no pet.) (mem. op., not designated for publication) ("Since evidence of prior assaults against the same victim bears on the nature of the relationship between the defendant and the victim, it is relevant evidence."). In this regard, the evidence at trial indicated that the parties engaged in a "cycle of violence" whereby appellant engaged in violent acts toward Tina, then repented and ceased the violence, engaging in a "honeymoon"-like period of reconciliation, then began again with violent acts. Similarly, the relationship was marked with repeated representations by both parties regarding whether those violent acts in fact occurred. The evidence further indicated that a victim of violence often lies to protect the aggressor. Second, the extraneous offenses were also relevant because they "ha[d] a tendency to make probable the State's theory that [the defendant] possessed the requisite intent at the time of the offense." *Smith v. State*, 314 S.W.3d 576, 592 (Tex. App.—Texarkana 2010, no pet.); *see* TEX. R. EVID. 404(b). And third, one of the recognized justifications for the admission of a defendant's extraneous offenses is to rebut defensive theories such as fabrication or retaliation. *See Bass*, 270 S.W.3d at 562–63; *Donald*, 543 S.W.3d at 482–83; *Sandoval*, 409 S.W.3d at 301. These defensive theories were both presented in the appellant's opening statement. In this case, it is at least subject to reasonable disagreement whether the extraneous offense evidence

was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory that Tina fabricated her allegations against him and of rebutting the defensive theory suggesting that Tina retaliated against appellant for his affairs. *See Bass*, 270 S.W.3d at 563. The trial court thus did not abuse its discretion in deciding that the extraneous offense evidence was relevant.

### 3. Prejudicial and Cumulative

On appeal, appellant further contends that even if this evidence was relevant, it was more prejudicial than probative. *See* TEX. R. EVID. 403. However, the record is devoid of any objection on this basis or a request for the trial court to perform a balancing test under Rule 403. *See id.* In this regard, an extraneous offense objection at trial will not preserve a Rule 403 complaint on appeal. *See Bell v. State*, 938 S.W.2d 35, 49 (Tex. Crim. App. 1996) (concluding that the issue of whether evidence was "highly prejudicial" was not preserved where appellant objected on relevance but "did not raise a separate trial objection to the evidence based upon Rule 403"); *Montgomery*, 810 S.W.2d at 388 (holding that an objection based on Rule 403 is required before the trial court will balance the probative value of the evidence against the prejudicial effect of that evidence); *Keller v. State*, 604 S.W.3d 214, 228 (Tex. App.—Dallas 2020, pet. ref'd) (concluding that when the trial court admits extraneous offenses pursuant to article 38.371, an appellant must object at trial that the probative value of the extraneous offense is substantially outweighed by the risk of undue prejudice to preserve a Rule 403 complaint on appeal). We thus do not further address this argument.

Appellant additionally argues that he was convicted for the "cumulative evidence" of prior bad acts and not for the acts contained in the indictment. "[A] number of errors may be found harmful in their cumulative effect." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (en banc) (citing *Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988) (op. on reh'g)); *Melancon v. State*, 66 S.W.3d 375, 385 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (en banc). In contrast, non-errors do not produce harm in their cumulative effect. *Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000); *Chamberlain*, 998 S.W.3d at 238; *see also Buntion v. State*, 482 S.W.3d 58, 79 (Tex. Crim. App. 2016). The cumulative doctrine provides relief only if the cumulative effect of errors rendered the trial fundamentally unfair. *See Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (citing *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004)); *Linney v. State*, 401 S.W.3d 764, 782 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). We have found no errors in the admission of evidence, and accordingly, reject appellant's arguments otherwise.

### 4.    Conclusion

We overrule appellant's second issue regarding the admission of extraneous offense evidence.

### IV.    LEGAL SUFFICIENCY

In his third issue, appellant asserts that the evidence presented at trial was legally insufficient to prove that he was guilty of each of the three counts contained in the indictment.

## A. Standard of Review

The Texas Court of Criminal Appeals has explained our legal sufficiency standard of review as follows:

> In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.

*Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). "The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240); *see Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009).

In our review of the sufficiency of the evidence, we examine the "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hammack*, 622 S.W.3d at 914 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)); *see Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an

54

actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hammack*, 622 S.W.3d at 914–15. "The jury is the sole judge of the credibility of a witness's testimony and the weight to assign to that testimony," and "the jury can believe all, some, or none of a witness's testimony." *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). When the jury could reasonably draw conflicting or contradictory inferences from the evidence, we presume that the jury resolved the conflicts in favor of the verdict. *See Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020); *Metcalf*, 597 S.W.3d at 856.

**B.     Count 1: Continuous Family Violence**

Appellant contends that that the evidence is legally insufficient to support his conviction for continuous family violence. *See* TEX. PENAL CODE ANN. § 25.11(e). Appellant asserts that this conviction should be overturned because "the incident of November 25, 2018 was not proven beyond a reasonable doubt." Appellant argues that Tina told the police officers "he didn't do nothing to me," the police officers did not see bruising on Tina's arms, and Tina never told the police that appellant's actions caused her pain. Appellant argues that assault is a required element of continuous family violence, and assault requires "causing bodily pain." Appellant urges that the evidence at trial instead showed that Tina knew about appellant's affair with DeLeon and "[r]etaliation was the motive to lie."

Under the Texas Penal Code, a person commits continuous violence against the family "if, during a period that is [twelve] months or less in duration, the person two or more times engages in conduct that constitutes an offense under [§] 22.01(a)(1) against

55

another person or persons whose relationship to or association with the defendant" is defined by various sections of the Texas Family Code. TEX. PENAL CODE ANN. § 25.11(a). A person commits assault under § 22.01(a)(1) if that person "intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse." *Id.* § 22.01(a)(1). "Bodily injury" means "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8). The offense of continuous family violence requires the defendant to be in a specific relationship to the other person; specifically, they must be in a dating relationship, a family member, or a member of the household. *See id.* § 25.11(a); TEX. FAM. CODE ANN. § 71.0021(b) (defining a "dating relationship"); *id.* § 71.003 (defining "family"); *id.* § 71.005 (defining "household").

The indictment in this case stated that appellant, on or about November 25, 2018, caused bodily injury to Tina by "grabbing" her and "striking" her. The jury charge tracked the statutory language, included applicable definitions, and asked whether the State had proved six elements: (1) appellant, on or about November 25, 2018, caused bodily injury to Tina by grabbing her, (2) appellant did so either intending to cause injury, knowing that injury would be caused, or with recklessness about whether injury would be caused, (3) appellant, on or about November 25, 2018, caused bodily injury to Tina by striking her, (4) appellant did so either intending to cause injury, knowing that injury would be caused, or with recklessness about whether injury would be caused, (5) the two acts occurred within twelve months or less, and (6) the bodily injury was against a family member or a member of appellant's household.

56

As stated previously, appellant contends that the evidence is legally insufficient to support his conviction for continuous family violence. In this regard, appellant attacks only the evidence concerning the events of November 25, 2018, and does not address the myriad of other offenses addressed at trial. Accordingly, we focus on appellant's allegations that Tina denied that appellant assaulted her at the time, she did not complain of pain to the police officers, and the police officers did not see any injuries.

We examine the statutory requirements. As a threshold matter, the statutory definition of "bodily injury" "appears to be purposefully broad and seems to encompass even relatively minor physical contacts so long as they constitute more than mere offensive touching." *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989) (en banc). "Any physical pain, however minor, will suffice to establish bodily injury." *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012); *see McCall v. State*, 635 S.W.3d 261, 272 (Tex. App.—Austin 2021, pet. ref'd). "A fact finder may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some of the natural causes of it." *Garcia*, 367 S.W.3d at 688; *see Coleman v. State*, 631 S.W.3d 744, 751 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). "The existence of a cut, bruise, or scrape on the body is sufficient evidence of physical pain necessary to establish 'bodily injury' within the meaning of the statute." *Arzaga v. State*, 86 S.W.3d 767, 778 (Tex. App.—El Paso 2002, no pet.).

Based on the record, appellant correctly states that Tina did not tell the police officers that appellant's actions caused her pain and that the police officers examined Tina's arms and saw no injuries. However, Tina testified that appellant grabbed her twice:

57

"forcefully" from one side, then as she turned, from the other side. *See Metcalf*, 597 S.W.3d at 855. She testified that "[i]t was to the point where you could feel it burn, the sides of your arms," and responded affirmatively when asked if she felt pain. Elijah testified that he saw appellant grab his mother by the arms, twist her, and swing her around in a forceful and hard manner. Subsequently, Elijah examined his mother's arms and saw "discoloring" on her skin—not bruising—"but not skin as normal."

Measuring the legal sufficiency of the evidence in this case in the light most favorable to the jury's verdict to determine whether any rational jury could have found beyond a reasonable doubt that appellant committed the offense of continuance family violence, and doing so in accordance with the elements of the offense as defined by a hypothetically correct jury charge, we conclude that there was sufficient evidence for the jury to have found that appellant committed family violence during each of the two events mentioned in the jury charge. *See Hill v. State*, 455 S.W.3d 271, 274 (Tex. App.—Texarkana 2015, pet. ref'd). That being the case, there was sufficient evidence to support a finding by the jury that appellant committed continuous family violence. We overrule appellant's challenge to the legal sufficiency of this conviction.

## C. Count 2: Tampering with a Witness

Appellant contends that the evidence is legally insufficient to support his conviction for tampering with a witness. *See* TEX. PENAL CODE ANN. § 36.05(d). According to appellant, "[Tina] was in charge of the whole recording session," "[s]he recorded [appellant] as he was asking for it, she recorded his statement as she wanted him to ask for it, and then recorded a statement that indeed nothing happened during the early

58

morning hours of November 23, 2018." Appellant also contends that there was "no official proceeding" because Tina told the police that she did not wish to file a complaint and appellant had not been arrested. According to the appellant's brief, appellant wanted the recording "to stay out of trouble with Internal Affairs, Corpus Christi Police Department."

The "witness tampering" section of the penal code, *id.* § 36.05, is part of the "Bribery and Corrupt Influence" chapter of the penal code and "has been interpreted broadly to prohibit corruption of the judicial process." *Arnold v. State*, 68 S.W.3d 93, 98 (Tex. App.—Dallas 2001, pet. ref'd); *see Navarro v. State*, 810 S.W.2d 432, 437 (Tex. App.—San Antonio 1991, pet. ref'd) (concluding that the offense of tampering with a witness was complete when the appellant offered a benefit to a witness in manner calculated to cause false testimony). In relevant part, § 36.05 provides that "[a] person commits an offense if, with intent to influence the witness, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding, or he coerces a witness or a prospective witness in an official proceeding . . . to testify falsely." TEX. PENAL CODE ANN. § 36.05(a)(1); *see Mitchell v. State*, 572 S.W.3d 303, 306–07 (Tex. App.—Texarkana 2019, no pet.). The statute provides that the offense is a third-degree felony unless the "official proceeding is part of the prosecution of a criminal case," in which case "an offense under this section is the same category of offense as the most serious offense charged in that criminal case." TEX. PENAL CODE ANN. § 36.05(d). Under the penal code, an "official proceeding" is "any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant." *Id.* § 1.07(a)(33); *see Nzewi v. State*, 359 S.W.3d 829, 833 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

"[A] person may be guilty of witness tampering if he solicits a witness or prospective witness in an official proceeding to testify falsely, whether during an official proceeding or deposition or in an affidavit." *Nzewi*, 359 S.W.3d at 842. The penal code defines "coercion" as, inter alia, a threat "to inflict bodily injury in the future on the person threatened or another," a threat "to accuse a person of any offense," and a threat "to expose a person to hatred, contempt, or ridicule." TEX. PENAL CODE ANN. § 1.07(a)(9)(B),(C),(D); *see also Fountain v. State*, No. 02-15-00369-CR, 2016 WL 4040520, at *3 (Tex. App.—Fort Worth July 28, 2016, no pet.) (mem. op., not designated for publication).

The indictment alleged that appellant coerced Tina, "who was then and there a witness in an official proceeding, to-wit: criminal investigation, by offers of financial support, with intent to influence [Tina] to testify falsely in said official proceeding." The jury charge tracked the statutory language, included applicable definitions, and asked the jurors whether the State had proved four elements: (1) appellant, on or about November 25, 2018, coerced Tina; (2) Tina was a witness in an official proceeding, specifically a criminal investigation; (3) the coercion was to testify falsely; and (4) appellant did so with intent to influence Tina, the witness.

Appellant argues, in sum, that the evidence fails to show that he coerced Tina, because they mutually agreed to make the statements, and that the evidence further fails to show that Tina was a witness or prospective witness in an official proceeding. We first address appellant's contention that Tina's false statement was voluntary rather than coerced. Tina explained that the night of November 25, 2018, appellant called her

60

"several times," and one call spanned "an hour and a half." Appellant told Tina "that he was going to end his life." He came to their home, woke her and "trie[d] to tell [her] everything that might happen." Tina offered to "just say that it didn't happen," and told appellant that she did not want to make a recording recanting her allegations against him, but he told her it was "all [her] fucking fault." She cried and felt bad, so she agreed to make the "fake recording that he asked [her] for." Tina acknowledged that she felt "pressured to" make the fake recording because, among other reasons, appellant told her he would lose his job and he was "really hoping that [she] would change [her] mind and drop the divorce." Tina further referenced appellant's comments challenging her credibility and threatening criminal ramifications: "Nobody is going to believe your shit"; "[Y]ou already talked in court and you committed perjury"; and "[Y]ou are going to get in trouble[,] and you are going to go to prison." Detective Lopez testified that in the audio recording that he heard, appellant was pressuring Tina into making a statement for the criminal investigation.

While there is some evidence that the recordings were made as a quid-pro-quo agreement insofar as Tina agreed to provide the false recording in exchange for appellant "to record that [appellant was] asking [her] for this," we conclude that there was sufficient evidence for the jury to conclude that Tina was coerced into making the false statement by virtue of appellant's threats to commit suicide, appellant's allegations that he would lose his job, and vague threats of criminal prosecution for committing perjury. We further note that the trial was permeated with testimony regarding appellant's financial obligations to Tina in terms of child support and her share of his retirement accounts, thereby

61

suggesting that Tina would suffer financially if she did not provide the false statement. As previously discussed, it is the jury's role, not ours, to judge the credibility of the witnesses and weigh the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04. We conclude that the evidence was legally sufficient to support the "coercion" element of the statutory offense.

We turn our attention to whether the evidence supported the statutory requirement of an "official proceeding." Appellant contends that he had not been charged or arrested at the point in time when the false recording was made, however, Lieutenant Paredez confirmed that appellant "had knowledge of a report" and "had knowledge of an investigation ongoing." We note that the statute refers to a witness or a "prospective" witness, and under the penal code, an "official proceeding" is "any type of administrative, executive, legislative, or judicial proceeding that *may* be conducted before a public servant." *Id.* § 1.07(a)(33) (emphasis added). The court of criminal appeals has held that a "prospective witness" encompasses any person who may testify in an official proceeding, any person who is involved in an offense with a defendant, who sees the defendant committing an offense, or who hears the defendant discuss committing an offense, and that "[f]ormal proceedings need not be initiated." *Ortiz v. State*, 93 S.W.3d 79, 86 (Tex. Crim. App. 2002) (en banc) (internal quotations and footnotes omitted) (addressing the sufficiency of evidence to prove the "prospective witness" element of a retaliation offense); *see also id.* at 95–96 (Keller, J., concurring) (explaining that the term "prospective witness" has the same meaning under the retaliation statute and under the tampering statute). We conclude that the "official proceeding" referenced in the statute

62

encompasses a pending investigation as described by the circumstances of this case. *Id.* at 86 (stating that formal proceedings need not have been initiated); TEX. PENAL CODE ANN. § 1.07(a)(33) (defining "official proceeding" as including "any type of . . . judicial proceeding that *may* be conducted before a public servant") (emphasis added); *Nzewi*, 359 S.W.3d at 833 ("[T]he witness-tampering statute is not limited to witnesses or prospective witnesses who may be called by the State to give testimony during criminal trials."); *see also* TEX. PENAL CODE ANN. § 1.05(a) (providing in relevant part that the provisions of the penal code "shall be construed according to the fair import of their terms"); *Fountain*, 2016 WL 4040520, at *3 (upholding a tampering charge where the State offered "no direct proof of any disorderly conduct proceeding or any civil lawsuit for Mr. Barnett to participate in as a witness or a prospective witness").

Thus, viewed in the light most favorable to the judgment, a rational trier of fact could have found beyond a reasonable doubt that Tina, as a prospective witness in an official proceeding, was coerced to make a false statement. *See Hammack*, 622 S.W.3d at 914. We overrule appellant's challenge to the legal sufficiency of this conviction.

**D.      Count Three: Tampering/Fabricating Physical Evidence**

Appellant contends that that the evidence is legally insufficient to support his conviction for tampering with evidence. *See* TEX. PENAL CODE ANN. § 37.09(c). Section 37.09 of the Texas Penal Code is entitled "Tampering With or Fabricating Physical Evidence." A person commits an offense under this section if, in relevant part, "knowing that an investigation or official proceeding is pending or in progress," that person "makes, presents, or uses any record, document, or thing with knowledge of its falsity and with

63

intent to affect the course or outcome of the investigation or official proceeding." *Id.* § 37.09(a)(2). Count three of the indictment alleged that on or about November 25, 2018, appellant:

> did then and there, knowing that an investigation and/or official proceeding was pending and/or in progress, namely an internal affairs investigation and/or a criminal investigation, intentionally and knowingly make and/or present and/or use a recording, namely an audio recording, with knowledge of its falsity and with intent to affect the course or outcome of the internal affairs investigation and/or a criminal investigation.

The jury charge tracked the statutory language, included applicable definitions, and asked the jurors whether the State had proved five elements: (1) appellant, on or about November 25, 2018, made or presented or used an audio recording, (2) the audio recording was false, (3) the appellant knew that an internal affairs investigation or a criminal investigation, an investigation or official proceeding, was pending or in progress, (4) the defendant had knowledge of the falsity of the audio recording, and (5) appellant had the intent to affect the course or outcome of the investigation or official proceeding.

Appellant argues that the State failed to prove that he altered or fabricated a physical "thing" as the caption or title to § 37.09 implies, and that a misrepresentation in Tina's statement does not fall within the scope of § 37.09. Appellant further asserts that he had no knowledge of the statement's falsity, or that there was an ongoing investigation. Appellant asserts that the State should have indicted him instead under Texas Penal Code § 37.08 which includes a reference to false "statements." *See id.* § 37.08 (governing false reports to peace officers, federal special investigators, law enforcement employees, corrections officers, and jailers).

64

The Texas Court of Criminal Appeals explained the purpose of § 37.09 thusly:

> The purpose of [§] 37.09 is to maintain the honesty, integrity, and reliability of the justice system and prohibiting *anyone*—including members of the government—from creating, destroying, forging, altering, or otherwise tampering with evidence that may be used in an official investigation or judicial proceeding. Obstruction-of-justice offenses, such as tampering with evidence or government documents, address "the harm that comes from the [actor's] disobedience of the law—damage to the authority of the government; a lessening of the public's confidence in our institutions; public cynicism, fear, and uncertainty; and a social climate that is likely to lead to even greater disobedience." Public scandals involving police and "throw down" guns, pool-chalk wrapped to look like cocaine used as evidence to prosecute innocent people, false offense reports, and the like are not unheard of in this state. Neither police nor private individuals have a license to fabricate documents or other evidence and then use them to affect a criminal investigation or other official proceeding.

*Wilson*, 311 S.W.3d at 460–61 (internal footnotes omitted) (citing *De La Paz*, 279 S.W.3d at 338); *see Welsh v. State*, 570 S.W.3d 963, 966 (Tex. App.—Amarillo 2019, pet. ref'd).

In attacking the legal sufficiency of the evidence supporting his conviction for tampering with or fabricating physical evidence, appellant argues, in summary, that when a defendant lies to the police, he conceals information, not physical evidence as required by the statute. Appellant cites three cases in support of this allegation. *See Welsh*, 570 S.W.3d at 967; *Rotenberry v. State*, 245 S.W.3d 583, 586 (Tex. App.—Fort Worth 2007, pet. ref'd); *Carrion v. State*, 926 S.W.2d 625, 626–29 (Tex. App.—Eastland 1996, pet. ref'd), *overruled on other grounds by Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).

In *Carrion*, the appellant told the police that he had been assaulted and provided the police with a stick that he alleged had been used in the assault. *See* 926 S.W.2d at 626–27. He was subsequently indicted and convicted for two separate offenses under

65

§ 37.09: (1) for fabricating the police report or affidavit that he provided, and (2) for "fabricating a club." *Id.* at 627. In examining the legal sufficiency of the evidence for the conviction regarding the police report or affidavit, the Eastland Court of Appeals noted that it found "no cases where solely giving a false statement rises to the level of fabricating physical evidence." *Id.* at 627. That court concluded that, nevertheless, the essential elements of the crime had been satisfied because appellant signed an affidavit in support of his report, and "[u]pon signing the affidavit, appellant adopted its contents knowing that the affidavit was to be used to affect the outcome of the investigation . . . ." *Id.* at 628. The court thus overruled appellant's legal sufficiency issue under § 37.09. *Id.* In contrast, the court concluded that the evidence was not legally sufficient to support a conviction under § 37.09 for appellant's representation that the stick had been used in the assault. *Id.* "It was appellant's statement to Officer Perkins that was false, not the club. An oral statement is not physical evidence." *Id.*

In *Rotenberry*, the appellant murdered a relative, concealed the body in a septic tank, and lied to the police by telling them that he did not know the location of the corpse. *See* 245 S.W.3d at 585–86. After examining the statutory language of § 37.09, which focuses on physical evidence, and comparing and contrasting it to other provisions in the penal code which criminalize the concealment of information, the Fort Worth Court of Appeals concluded that lying to the police or withholding information did not fall within the parameters of § 37.09. *Id.* at 589 (examining the caption and text of § 37.09 in comparison to § 37.08 and § 37.081 governing false reports). According to that court, "Lying to conceal information material to an investigation is a crime, but it is not a violation of [§] 37.09." *Id.*

66

at 587.

In *Welsh*, the appellant falsely told the police that he had been assaulted by the staff of the facility that housed him as a sexually violent predator, and the State prosecuted appellant under § 37.09. *See* 570 S.W.3d at 965. After examining *Rotenberry* and *Carrion*, the Amarillo Court of Appeals concluded "that the conveyance of knowingly false information about the cause of real injuries is not a violation of [§] 37.09(a)(2)." *Id.* at 967. The court thus reversed appellant's conviction.

In contrast, the State contends that these cases are distinguishable, and our analysis should be controlled by, for instance, *Waldrop v. State*, 219 S.W.3d 531, 533–38 (Tex. App.—Texarkana 2007, no pet.). In *Waldrop*, the appellant called the police department making allegations that her former husband had sexually abused their daughters. *Id.* at 533. The appellant ultimately provided the sheriff's department with an audio recording of the girls' accounts of the sexual abuse. *Id.* The Texarkana Court of Appeals examined whether appellant "presented" the audiotape, whether the appellant "made" the audiotape, and whether she knew it was false. *Id.* at 535–37. The court did not directly address whether the audiotape constituted a "record, document, or thing" under the statute. *See id.* at 533–38.

We examine the specific facts and circumstances of this case in light of the foregoing authority. Lieutenant Paredez testified that appellant called him, told him that he had been involved in an altercation with his wife and that he had an audio recording that he needed to provide to law enforcement, and asked if Lieutenant Paredez could meet with him "to hand [Lieutenant Paredez] that recording." Appellant declined to email

the audio recording to Lieutenant Paredez, and Lieutenant Paredez thus recorded the audio recording on his cell phone. Lieutenant Paredez furnished Detective Flores with his phone so that Detective Flores could download the recording to the server and put it in the case file. When Lieutenant Paredez heard the recording of Tina "basically stating on the recording that she had made up the assault," he thought it was "exculpatory evidence for the [d]efense," and this was an "open and shut case."

We disagree with appellant's characterization of the events in this case. Here, we are not examining appellant's false statements or false report to Lieutenant Paredez regarding the events at issue. In fact, Lieutenant Paredez stated explicitly that he did not take appellant's statement in the course of obtaining the audio recording. Instead, our attention is on the audio recording that appellant gave Lieutenant Paredez containing Tina's false statement. We conclude that the audio recording constitutes a "record, document, or thing" under § 37.09. *See* TEX. PENAL CODE ANN. § 37.09(a)(2); *cf. Welsh*, 570 S.W.3d at 967; *Rotenberry*, 245 S.W.3d at 586; *Carrion*, 926 S.W.2d at 626–29.

In contesting the legal sufficiency of the evidence supporting his conviction under § 37.09, appellant also asserts that he had no knowledge of the recording's falsity. However, the jury in this case heard Tina's testimony that the recording was false and heard recordings in which appellant confessed to the assault, solicited the false recording from Tina, and made the false recording with Tina. Again, the jury was the sole judge of the credibility of the witnesses. *See Metcalf*, 597 S.W.3d at 855.

We overrule appellant's contention that the evidence was legally insufficient to support his conviction for making, presenting, or using, a record or thing with knowledge

68

of its falsity and with intent to affect the course or outcome of the investigation or official proceeding. *See* Tex. Penal Code Ann. § 37.09(a)(2).

**E.      Summary**

We have carefully considered the legal sufficiency of the evidence as to each of the three convictions, and having done so, we overrule appellant's third and final issue.

## V.      Conclusion

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Do not publish.
Tex. R. App. P. 47.2 (b).

Delivered and filed on the
18th day of August, 2022.